[Cite as *In re L.B.*, 2020-Ohio-3834.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

IN RE: L.B.

C.A. No.     20CA0008-M
              20CA0010-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    2017 09 DE 0069

DECISION AND JOURNAL ENTRY

Dated: July 27, 2020

CALLAHAN, Presiding Judge.

{¶1} Appellants, R.M. ("Mother") and M.R. ("Grandmother"), appeal from a judgment of the Medina County Court of Common Pleas, Juvenile Division, that placed a minor child in the permanent custody of Medina County Job and Family Services ("MCJFS"). This Court affirms.

I.

{¶2} Mother is the biological mother of L.B., born December 23, 2004. Grandmother is L.B.'s maternal grandmother. L.B.'s father ("Father") did not participate in the final hearing and has not appealed from the permanent custody judgment.

{¶3} Although L.B's custodial history is not entirely clear from the record, Grandmother raised L.B. for most of the child's pre-school years because Mother and Father had serious, untreated mental health and drug problems. L.B. was officially placed in Grandmother's legal custody when she was three years old because Mother was incarcerated.

{¶4}    When it was time for L.B. to begin school, Grandmother placed L.B. in the legal custody of a family friend, T.B., apparently because Grandmother was unable to drive the child back and forth to school.  Six years later, T.B. returned L.B. to Grandmother because L.B. was exhibiting serious mental health and behavioral problems and T.B. was not willing to take the child to counseling.  L.B. apparently had a long history of untreated mental health problems and her behavioral problems continued to escalate before and during this case.

{¶5}    On May 22, 2017, L.B. got into an altercation with Grandmother, during which she struck Grandmother with her arm, attempted to suffocate Grandmother with a plastic bag, and threatened to hit her with a hammer.  Grandmother escaped the house and called the police.  Although L.B. faced a juvenile delinquency complaint for the act of domestic violence, she was apparently returned to Grandmother's home shortly after that incident.

{¶6}    Within the next few months, L.B. committed domestic violence against Mother.  Grandmother had allowed Mother and L.B. to be together in violation of a no contact order that prohibited the two from having any contact because Mother had allowed L.B. to have drugs, alcohol, contact with older boys, and otherwise facilitated her inappropriate and dangerous behavior.  Although Grandmother realized that Mother was a bad influence on L.B. and that L.B.'s behavior regressed around her, she repeatedly allowed, and even facilitated, contact between L.B. and Mother.

{¶7}    L.B. became violent with Mother after Mother tried to stop L.B. from harming the family cat.  L.B. responded by punching Mother.  Further physical violence ensued between the two until the police arrived.  L.B. was again alleged to be a delinquent child for the act of domestic violence against Mother and for violating the no contact order.  L.B. was later adjudicated a delinquent child for the two acts of domestic violence and for violating the no contact order.

{¶8}   MCJFS filed the complaint in this case on September 5, 2017. It alleged that L.B. was a dependent child because Grandmother had hip surgery and was not physically capable of caring for L.B. and was overwhelmed by the child's behavioral problems. At that time, L.B. was in a juvenile detention center.

{¶9}   L.B. was adjudicated a dependent child in this case on October 31, 2017. Although Mother and Father were on the original case plan, they did not make much progress on goals to reunify them with their child. Father made some progress early in the case but later relapsed and began using drugs again. Mother did not work with MCJFS and eventually asked to be removed from the case plan.

{¶10}   From the beginning of this case, Grandmother was the only viable option for family reunification. Although the agency realized that Grandmother and L.B. loved each other, the greatest concern was Grandmother's ability to understand the severity of L.B.'s problems and to provide appropriate boundaries and care for L.B. Grandmother engaged in counseling but did not make much progress in understanding the severity of L.B.'s problems or her need to modify her manner of parenting the child.

{¶11}   L.B. engaged in extreme self-harming behavior before and during this case, including repeated suicide attempts, daily cutting, and other self-harming behavior. L.B., who was 13 to 15 years old during this case, also frequently used alcohol and drugs and engaged in sexual activity with older boys that she did not know, usually after contacting them via the internet. The terms of L.B.'s probation prohibited her from engaging in any of those activities, including having access to the internet or any contact with Mother.

{¶12}   Although MCJFS worked to reunify Grandmother and L.B., Grandmother continued to allow L.B. to have contact with Mother. At one point, Mother gave L.B. a cell phone

and encouraged her to contact older boys on the internet. Grandmother also failed to set appropriate boundaries for L.B. to ensure that she did not violate other conditions of her probation that were intended to safeguard the child's safety.

{¶13} For example, Grandmother had turned off the internet at her house, but she would take L.B. to the middle school near her home so that L.B. could play computer games and swing on the swings. According to Grandmother, the swinging and gameplaying seemed to calm L.B. Grandmother, admittedly unaware of how hand-held devices or the internet works, did not realize that L.B. could use her gaming device[1] and the school's WiFi to access the internet and contact older boys.

{¶14} The initial plan in this case was for L.B. to ultimately return to Grandmother's home. On July 3, 2019, however, while on an extended visit with Grandmother, L.B. slipped out of the home at night and went to the middle school to gain access to the school's internet so she could contact an older boy that she had met in her treatment facility. Grandmother did not realize that L.B. was gone until the police brought her home. Grandmother responded to MCJFS that L.B. had made a "pinky" promise that she would not leave the home and Grandmother believed that L.B.'s promise was an adequate safeguard to prevent the child from leaving the home.

{¶15} Authorities also learned at that time that L.B. had been cutting herself on a regular basis. Although Grandmother was aware that L.B. had been cutting herself, she did not report the activity to anyone because she did not believe that the cuts were serious or that L.B. posed any danger to herself or others. L.B. was readmitted to the juvenile detention center for violating the terms of her probation and because of concerns that she posed a risk to her own safety, the safety

---

[1] It is unclear from the record whether L.B. used a cell phone or another type of device to play games and access the internet.

of others, and that she was a flight risk. L.B. was later released into two different residential mental health treatment facilities.

{¶16} On August 5, 2019, MCJFS moved for permanent custody of L.B. At the time of the hearing, L.B. remained in a lockdown residential treatment facility because her defiant and self-harming behavior was still not under control. L.B. did not appear at the hearing because counselors at the facility believed that her participation in the hearing would be detrimental to her mental health. Evidence at the hearing revealed that L.B. would continue to require residential treatment for several more months. After her release from the facility, L.B.'s counselors opined that she would require ongoing counseling and would need a caregiver who would ensure that she continued in a structured environment and followed up with ongoing counseling and medication management.

{¶17} Following the hearing, the trial court denied Grandmother's oral motion for legal custody, terminated parental rights, and placed L.B. in the permanent custody of MCJFS. Mother and Grandmother separately appealed and their appeals were later consolidated. They raise a total of three assignments of error, two of which will be consolidated for ease of analysis.

II.

**GRANDMOTHER'S ASSIGNMENT OF ERROR I**

THE TRIAL COURT'S DECISION TO NOT CONSIDER [GRANDMOTHER'S] LEGAL CUSTODY MOTION WAS CONTRARY TO LAW AND NOT IN THE BEST INTEREST OF L.B.

{¶18} Grandmother's first assignment of error is that the trial court erred in denying her oral motion for legal custody "for no other reason than the motion was not made in writing." At the commencement of the permanent custody hearing, Grandmother's trial counsel stated on the

record that Grandmother was seeking legal custody of L.B. Grandmother had not filed a written motion prior to the hearing.

{¶19} After an adjudication of abuse, neglect, or dependency, R.C. 2151.353(A)(3) authorizes the trial court to award legal custody to a parent or "to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings." Courts have held that the juvenile court lacks authority to award legal custody to a nonparent who fails to comply with the explicit requirements of R.C. 2151.353(A)(3) to file a motion for legal custody prior to the dispositional hearing. *In re Lewis*, 9th Dist. Lorain No. 98CA007237, 1999 WL 743875, *2 (Sept. 22, 1999). *See also*, *In re L.R.T.*, 165 Ohio App.3d 77, 2006-Ohio-207, ¶ 17-18 (12th Dist.); *In re Barcelo*, 11th Dist. Geauga No. 97-G-2095, 2000 WL 489731, *8 (June 26, 1998); *In re Farace*, 4th Dist. Scioto No. 96CA2469, 1997 WL 802819, *4 (Dec.31, 1997); *In re Fleming*, 8th Dist. Cuyahoga No. 63911, 1993 WL 277186, *8-9 (July 22, 1993) .

{¶20} Because Grandmother did not file a written motion for legal custody prior to the final dispositional hearing, nor did any other party file a motion seeking legal custody to Grandmother, the trial court did not err in denying her counsel's oral request for legal custody that was made at the final hearing. Grandmother's first assignment of error is overruled.

### GRANDMOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN NOT GRANTING APPELLANT-GRANDMOTHER'S MOTION FOR LEGAL CUSTODY AS IT WAS IN L.B.'S BEST INTEREST.

### MOTHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY DENYING [GRANDMOTHER'S] MOTION FOR LEGAL CUSTODY AND

TERMINATING MOTHER'S PARENTAL RIGHTS AND GRANTING PERMANENT CUSTODY OF THE CHILD TO [MCJFS[].

{¶21} The remaining assignments of error challenge the trial court's decision to place L.B. in the permanent custody of MCJFS. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child in a parent's custody has been adjudicated abused, neglected, or dependent on three separate occasions; or the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶22} The trial court found that the first prong of the permanent custody test was satisfied because, among other reasons, L.B. had been in the temporary custody of MCJFS for at least 12 months of a consecutive 22-month period. *See* R.C. 2151.414(B)(1)(d). No one challenges that finding, which was supported by the record. The facts are not disputed that, at the time MCJFS moved for permanent custody, L.B. had been in its temporary custody for almost 22 months of a consecutive 22-month period.

{¶23} The sole issue on appeal is whether the trial court erred in finding that permanent custody was in the best interest of L.B. When determining the child's best interest under R.C. 2151.414(D), the juvenile court must consider all relevant factors, including the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the need for permanence in the child's life, and whether any of the factors set forth in R.C.

2151.414(E)(7) to (11) apply to the facts of the case. R.C. 2151.414(D)(1); *In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11. The trial court found that the factor set forth in R.C. 2151.414(E)(10) applied to the facts of this case because both parents had abandoned L.B.

{¶24} The evidence was overwhelming that it was not in the best interest of L.B. to return to the custody of a parent because Mother and Father had failed to make substantial progress on the reunification goals of the case plan. Specifically, they failed to stabilize their long-standing mental health and substance abuse problems.

{¶25} The sole dispute at the hearing was whether it was in the best interest of L.B. to terminate her legal relationship with Grandmother and be placed in the permanent custody of MCJFS. Witnesses agreed that Grandmother and L.B. loved each other and wanted to be reunited. The issue was how L.B.'s continued relationship with Grandmother would affect the child's progress toward stabilizing her mental health and behavioral problems.

{¶26} The interaction between Grandmother and L.B. during this case demonstrated that Grandmother did not appreciate the severity of L.B.'s problems but instead continued to enable her self-destructive behavior. Grandmother initially had unsupervised visits with L.B. but those visits were returned to supervised visits because Grandmother repeatedly allowed, or did not prevent, L.B. from violating the conditions of her probation.

{¶27} While L.B. was with Grandmother during this case, Grandmother continued to allow L.B. to communicate with Mother and to have access to the internet to communicate with older boys for sexual activity. Moreover, L.B. was cutting herself and otherwise inflicting harm on herself, but Grandmother did not report that behavior to L.B.'s probation officer or MCJFS. After the agency discovered that L.B. was cutting herself and questioned Grandmother, she

responded that she did not report the cuts or seek help for L.B. because the cuts did not appear to be a serious physical problem. She apparently did not recognize the self-harming behavior as an emotional problem. At the hearing, Grandmother further explained that she did not believe that L.B. should be confined to a treatment facility and just wanted her to live a "normal life."

{¶28} Grandmother had a mental health assessment during this case. The psychologist explained that Grandmother herself grew up in a dysfunctional family and that she tends to avoid problematic behavior rather than addressing it. She further explained that, although Grandmother realized that she needed to be stricter with L.B., she seemed to be unable to modify her unstructured approach to raising the child. The psychologist opined that Grandmother lacked an understanding of the severity of L.B.'s problems and did not understand why L.B. and Mother could not have an ongoing relationship. She described Grandmother's parenting approach as "naïve" and "not effective."

{¶29} During a period that Grandmother was allowing Mother to be in her home at the same time as L.B., L.B. discovered a used heroin syringe in the bathroom and reported it to MCJFS. When MCJFS confronted Grandmother about the used syringe, Grandmother insisted that it was not Mother's because Mother had been "really sick" at her home all day. Grandmother accepted Mother's explanation that the needle belonged to Mother's friend. Moreover, Grandmother did not accept any responsibility for the fact that someone had used heroin in her home, shortly before or while L.B. was there. Throughout this case, Grandmother continued to demonstrate that she did not understand and could not control the problems of L.B. and Mother.

{¶30} L.B. had expressed her wishes to return to Grandmother's home. As several witnesses explained, however, L.B. manipulated Grandmother so that she could do what she wanted to do. L.B.'s counselors had explained that the child must have firm boundaries to control

her self-destructive behavior. L.B. admitted to a counselor that Grandmother was not able to provide appropriate care for her on a regular basis. Grandmother also admitted that she had been unable to control L.B.'s self-destructive behavior.

{¶31} The guardian ad litem opined that permanent custody was in the best interest of L.B. because Grandmother had minimized L.B.'s self-harming behavior and did not grasp the "gravity" or "complexity" of L.B.'s mental health and behavioral problems. The guardian ad litem testified that L.B. had continued to attempt suicide and inflict harm upon herself as recently as the week before the hearing, while closely monitored in a mental health treatment facility. She stressed that L.B. "needs a lot more than just unconditional love. She needs help and intervention." She did not believe that Grandmother could provide L.B. with appropriate emotional support.

{¶32} L.B's custodial history included many years of moving in and out of temporary placements. Prior to this case, for nearly 14 years, L.B. was moved in and out of homes in which the caregivers did not take action to treat her serious mental health and behavioral problems.

{¶33} Before and throughout this case, L.B. had attempted suicide several times, repeatedly cut herself, and engaged in other self-harming behavior by using drugs and alcohol and engaging in sex with strangers while she was a young teenager. During this case, L.B. had continued to violate her probation and exhibit several acts of aggressive, self-harming, and suicidal behavior. For example, she took razor blades to school and distributed them to other classmates; stole a cell phone from another student; repeatedly had contact with Mother; and repeatedly obtained access to the internet and had inappropriate contact with older boys.

{¶34} In one of L.B.'s treatment facilities, she was written up for eight separate violations, including self-harming and violent behavior. At her most recent residential treatment facility, where L.B. remained at the time of the hearing, L.B. exhibited symptoms of eating disorders,

suicidal ideation, self-harming, and aggressive behavior. L.B.'s mental health and behavior were improving at that facility, but counselors there opined that L.B. would need several more months of residential treatment and would need to follow up with ongoing out-patient counseling and medication management.

{¶35} L.B. needed a legally secure permanent placement and MCJFS had been unable to find any suitable person who was able to provide such a placement. The trial court reasonably concluded that a secure permanent placement would be achieved by placing L.B. in the permanent custody of MCJFS. Mother and Grandmother have failed to demonstrate that the trial court erred in concluding that permanent custody was in the best interest of L.B. Mother's sole assignment of error and Grandmother's second assignment of error are overruled.

III.

{¶36} The assignments of error are overruled. The judgment of the Medina County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to

mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

_____
LYNNE S. CALLAHAN
FOR THE COURT

CARR, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

ERIC D. HALL, Attorney at Law, for Appellant.

PAUL M. GRANT, Attorney at Law, for Appellant.

JEREMY SZUCS, Attorney at Law, for Appellee.

AMANDA CASALINUOVO, Attorney at Law, for Appellee.

REBECCA CLARK, Attorney at Law, for L.B.

MICHELE SHERRIN, Guardian ad Litem.