[Cite as *In re N.S.*, 2023-Ohio-4285.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| N.S., | : | No. 23AP-151 |
| | | (C.P.C. No. 21JU-10686) |
| (T.D., | : | |
| | | (ACCELERATED CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on November 21, 2023

**On brief:** *Yeura Venters*, Public Defender, and *George M. Schumann*, for appellant T.D.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Childrens Services.

APPEAL from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch

BOGGS, J.

{¶ 1} Appellant, T.D. ("Mother"), appeals the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which overruled her objections to a magistrate's decision, adopted that decision as its own, and granted permanent custody of her minor children, N.S. (d.o.b. 4/29/2016), B.S. (d.o.b. 6/27/2019), and J.S. (d.o.b. 8/21/2020) to appellee, Franklin County Children's Services ("FCCS"), for purposes of adoption. For the following reasons, we affirm the trial court's judgment.

**I. PROCEDURAL HISTORY**

{¶ 2} On November 1, 2021, FCCS filed a complaint seeking permanent court commitment ("PCC"), of Mother's minor children, N.S., B.S, and J.S., for purposes of adoption.[1] FCCS alleged that the children were neglected and dependent children, as defined in R.C. 2151.03 and 2151.04. At that time, N.S. and B.S. had been in FCCS's

---

[1] Paternity has not been established with respect to any of the three children at issue in this case.

temporary custody since October 2019, and J.S. had been in FCCS's temporary custody since his birth in August 2020. A magistrate issued a temporary order of custody, continuing FCCS's temporary custody of the children, and ordered Mother and C.S., an alleged father of the children, to have no contact with the children.

{¶ 3} In the findings of fact and conclusions of law issued on November 3, 2021, the magistrate found that no parent had maintained contact with FCCS since the children were committed to FCCS's temporary custody in 2019 and 2020 and that the children were doing well in foster care. The magistrate found that FCCS had made reasonable efforts that failed to prevent the continued removal of the children from the home. The court appointed attorney J.R. Stremski as Guardian ad Litem ("GAL"), for the children.

{¶ 4} The magistrate held a trial, including both adjudicatory and dispositional phases, on FCCS's complaint for PCC over multiple days in January 2022. In decisions filed February 1, 2022, the magistrate found that N.S., B.S., and J.S. were dependent children, as defined in R.C. 2151.04(C), terminated the temporary order of custody, ordered that the children be made wards of the court, granted FCCS permanent custody of the children for purposes of adoption, and terminated Mother's and alleged fathers' parental rights. The magistrate subsequently issued findings of facts and conclusions of law on March 28, 2022.

{¶ 5} Mother filed timely objections to the magistrate's decision, as addressed more fully below, but the trial court overruled her objections, adopted the magistrate's decision, and committed N.S., B.S., and J.S. to the permanent custody of FCCS for purposes of adoption.

## II. FACTUAL BACKGROUND

{¶ 6} Although the procedural history stemming from the November 1, 2021 complaint is straightforward, FCCS's interactions with Mother and her children stretch back to shortly after N.S.'s birth in 2016. That history is relevant to the juvenile court's consideration of the November 1, 2021 complaint, which was the sixth refiling of a complaint regarding J.S. and the eighth refiling regarding N.S. and B.S.

{¶ 7} In October 2016, FCCS filed a complaint in Franklin C.P. No. 16JU-10-012095, alleging that five-month-old N.S. was a neglected and dependent child, and FCCS obtained from the juvenile court a temporary order of custody.[2] (Jan. 19, 2022 Tr. at 30;

---

[2] The court takes judicial notice of all cases relevant to this matter and involving these children.

Franklin C.P. No. 16JU-10-012095, Oct. 18, 2016 Mag.'s Order.)  In May 2017, in Franklin C.P. No. 17JU-3536 (a refiled neglect and dependency complaint regarding N.S.), the juvenile court adjudicated N.S. a dependent child, terminated the temporary order of custody, made N.S. a ward of the court, and committed her to the temporary custody of FCCS, pursuant to R.C. 2151.353(A)(2).  (Jan. 19, 2022 Tr. at 30; FCCS Ex. 19.)  The juvenile court approved and adopted a case plan that reflected objectives for reunification of Mother and N.S. (case No. 17JU-3536, May 16, 2017 Case Plan.)  FCCS filed a motion for PCC of N.S. in September 2018.

{¶ 8}    Mother gave birth to another child, C.S.,[3] on September 27, 2017, while N.S. remained in FCCS's temporary custody.  (Jan. 27, 2022 Tr. at 26.)  FCCS filed a complaint on October 18, 2017, in Franklin C.P. No. 17JU-12869, for temporary custody of C.S., whom it alleged was a dependent child.  FCCS caseworker Luann Layman, who was assigned to Mother and her children from July 2017 through early December 2021, testified that FCCS sought custody of C.S. because of Mother's lack of success in complying with her case plan regarding N.S.  The juvenile court adjudicated C.S. a dependent child and granted FCCS temporary custody of him in June 2018, under a refiled complaint in Franklin C.P. No. 18JU-4035.  FCCS moved for permanent custody of C.S in September 2018.  (Jan. 27, 2022 Tr. at 28-29; Franklin C.P. No. 18JU-004035, Sept. 7, 2018 Mot. for Permanent Custody.)

{¶ 9}    In May 2019, with Mother having made significant progress under her case plans, the juvenile court terminated FCCS's temporary custody of N.S. and C.S. and returned the children to Mother's care, under Court-Ordered Protective Supervision ("COPS").

{¶ 10}  Mother gave birth to B.S. on June 27, 2019.  FCCS did not immediately seek custody of B.S. because Mother "had completed a substantial amount of her case plan and was working on a transitional plan to be reunified" with N.S. and C.S.  (Jan. 27, 2022 Tr. at 31.)

{¶ 11}  On September 30, 2019, FCCS moved the juvenile court to terminate COPS as to N.S. and C.S., noting mother's engagement with mental health counseling,

---

[3] Because this child's initials are the same as one of the alleged father's initials, to avoid confusion, we refer to the alleged father as "alleged father C.S." and to the child simply as "C.S."

engagement with a psychiatrist for medication management, maintenance of housing for more than a year, and work with a parent mentor.

{¶ 12} On October 7, 2019, C.S. was transported to Nationwide Children's Hospital, unconscious and with severe, ultimately fatal, injuries. Mother gave inconsistent statements regarding the occurrence of C.S.'s injuries to Kelli White, a licensed independent social worker at Nationwide Children's Hospital. (Jan. 24, 2022 Tr. at 65-66.) C.S. died from his injuries on the next day, after surgery demonstrated that his injuries were not survivable. Dr. Jill Fitch, an expert in pediatric critical care, treated C.S. on the day he died; she testified that C.S. had "very severe injury to his stomach, his intestines, and all the associated structures in his abdomen." (Jan. 13, 2022 Tr. at 27.) C.S.'s admission note also reports an "obvious deformity of his right arm." (FCCS Ex. 17-J.) The hospital contacted the coroner's office out of concern that C.S.'s injuries had not been sustained as a result of an accident.

{¶ 13} FCCS caseworker Layman testified that N.S. and B.S. were evaluated at the hospital after C.S. was admitted, and they were found to have lice, scabies, and bruising. Layman was concerned about N.S. and B.S. because of their young age, their need for parental care, and the fact that the trauma to C.S. had occurred at home with Mother. FCCS obtained physical custody of N.S. and B.S. through officer acceptance for safekeeping on October 7, 2019.

{¶ 14} Mother was "pink slipped," referring to a process by which a person may be involuntarily held for a mental health evaluation if they are deemed to be a danger to themselves or others, and she was taken to River Vista Mental Health Hospital on October 7, 2019. (Jan. 19, 2022 Tr. at 43.)

{¶ 15} FCCS filed a complaint requesting custody of B.S. and a motion requesting custody of N.S. on October 8, 2019; the juvenile court granted FCCS temporary orders of custody on October 9, 2019. The children have remained in FCCS's continuous custody ever since. Consistent with a no-contact order that was included in the magistrate's orders, Mother has had no further contact with the children. There is no evidence that Mother engaged in any case-plan activity after October 8, 2019. In fact, Mother's attorneys thereafter permitted no contact between Mother and FCCS or between Mother and the children's GAL, and the last time caseworker Layman saw Mother was October 8, 2019.

Later in October 2019, Layman discovered that Mother had revoked her authorization for release of information to FCCS.

{¶ 16} Mother was indicted in April 2020 for murder and endangering children, related to C.S.'s injuries and death. (Jan. 27, 2022 Tr. at 38; FCCS Ex. 12, 16.) Mother remained in jail, awaiting trial, throughout the remainder of these proceedings, including the permanent custody trial.[4]

{¶ 17} While in pre-trial detention, Mother gave birth to yet another child, J.S., on August 21, 2020. FCCS filed a complaint in Franklin C.P. No. 20JU-006062 on August 24, 2020, alleging that J.S. was a neglected and dependent child, and requesting PCC of J.S.; the juvenile court issued a temporary order of custody the following day. (FCCS Ex. 6.) J.S. has remained in FCCS's continuous custody ever since.

{¶ 18} FCCS subsequently consolidated their requests for permanent custody of N.S, B.S., and J.S. into a single complaint. After various dismissals and re-filings, FCCS filed the PCC complaint that gave rise to these proceedings on November 1, 2021.

{¶ 19} The permanent custody trial for N.S., B.S., and J.S. commenced on January 13, 2021. Mother's attorney waived mother's appearance. (Jan. 13, 2022 Tr. at 6-7.) The children's alleged fathers, who had been served by publication, did not appear or participate in the trial. (Mar. 28, 2022 Findings of Fact Findings of Fact & Conclusions of Law at 1.) During the adjudicatory phase of the trial, FCCS presented testimony from (1) Dr. Jill Fitch, (2) Laura Smith, a release of information specialist employed by Nationwide Children's Hospital, (3) social worker White, and (4) caseworker Layman. During the dispositional phase, FCCS again called Layman and also called GAL Stremski. Mother did not call any witnesses.

{¶ 20} During the dispositional phase of the trial, Layman testified about FCCS's consideration of potential relative placements for the children. Mother had identified the parents of alleged father C.S. as a possible placement, but the alleged grandparents declined to pursue placement. Layman spoke with Mother's own mother about placement, but she also declined to pursue placement. Layman spoke with alleged father C.S.'s cousin, who

---

[4] We take judicial notice that, in Franklin C.P. No. 20CR-1690, Mother pleaded guilty to a stipulated-lesser-included offense of involuntary manslaughter, in violation of R.C. 2903.04, and to the charged offense of endangering children, in violation of R.C. 2919.22. The trial court imposed sentences of 11 to 16 and one half years for involuntary manslaughter and 7 years for endangering children, and ordered that those sentences run consecutively. (Franklin C.P. No. 20CR-1690, Sept. 15, 2022 Jgmt. Entry.)

lived with her husband in Oklahoma, but the cousin and her husband did not fulfill the requirements for interstate placement.

{¶ 21} In late October or early November 2019, prior to Mother's detention and J.S.'s birth, FCCS received a call from Jane McSorley Kennedy ("McSorley"), mother's half-sister, who expressed an interest in potentially receiving placement of the children. Mother had not previously mentioned McSorley to Layman as a potential placement. FCCS informed McSorley that it was not currently pursuing placement changes for the children, who had recently been placed with their foster family, and FCCS did not investigate McSorley as a potential placement. FCCS did not hear from McSorley again until January 2022, shortly before the permanent custody trial began. McSorley did not file a motion for legal custody of the children.

{¶ 22} Ultimately, the magistrate concluded that FCCS demonstrated by clear and convincing evidence that N.S., B.S., and J.S. were dependent children, as defined by R.C. 2151.04(C), "[g]iven the lack of any parent able to provide proper care for the children or to provide for the children's medical, educational, treatment, or basic needs, including but not limited to food, clothing, and shelter." (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 6.) The magistrate found that N.S., B.S., and J.S. could not be placed with a parent within a reasonable period or should not be placed with a parent. The magistrate then went on to find, pursuant to R.C. 2151.353(A)(4) and 2151.414(D)(1), that it was in the children's best interests for the court to grant permanent custody to FCCS for purposes of adoption.

{¶ 23} In her timely objections to the magistrate's decision, Mother objected, inter alia, to the magistrate's adjudication of the children as dependent based on Mother's unavailability, because FCCS refused to consider McSorley's request to care for the children during Mother's detention. Mother also argued that FCCS's failure to investigate McSorley as a potential relative placement rendered defective the magistrate's conclusion that granting PCC to FCCS was in the children's best interests. The juvenile court overruled Mother's objections, adopted the magistrate's decision, and committed N.S., B.S., and J.S. to the permanent custody of FCCS for purposes of adoption.

III. ASSIGNMENT OF ERROR

{¶ 24} Mother's single assignment of error states, "The juvenile court's judgment, that permanent court commitment of the minor children to [FCCS] was in the minor

children's best interests, is against the manifest weight of the evidence." (Appellant's Brief at i.) More specifically, Mother argues that the trial court's failure to consider FCCS's decision not to investigate McSorley as a potential relative placement for the children rendered against the manifest weight of the evidence the trial court's determination that an award of permanent custody was in the children's best interests. We disagree.

## IV. ANALYSIS

### A. Standard of review

{¶ 25} An appellate court will not reverse a trial court's determination in a permanent custody case unless the judgment is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28; *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 14. "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8. Accordingly, we may not reverse a permanent custody order that is supported by competent, credible evidence. *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, citing *In re Siders*, 10th Dist. No. 96APF04-413, 1996 Ohio App. LEXIS 4805, *9 (Oct. 29, 1996), citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992).

{¶ 26} In applying the manifest weight standard to a judgment that grants permanent custody of a child to FCCS, we " ' "must make every reasonable presumption in favor of the judgment and the trial court's findings of fact." ' " *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13, quoting *J.T.* at ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. A juvenile court's discretion in determining whether an order of permanent custody is in a child's best interest " 'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.' " *In re Hogle*, 10th Dist. No. 99AP-944, 2000 Ohio App. LEXIS 2813, *12-13 (June 27, 2000), quoting *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist.1994). If the evidence is susceptible of more than one construction, we give it that interpretation which is most favorable to sustaining the trial court's judgment. *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, citing *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

**B. R.C. 2151.353 and 2151.414**

{¶ 27} Pursuant to R.C. 2151.353(A)(4), a public children services agency may request permanent custody of a child as part of an abuse, neglect, or dependency complaint. *In re B.B.*, 10th Dist. No. 20AP-488, 2021-Ohio-2299, ¶ 23, citing *In re H.H.*, 10th Dist. No. 19AP-158, 2019-Ohio-4953, ¶ 45. FCCS sought in its November 1, 2021 complaint a PCC disposition of N.S., B.S., and J.S., for purposes of adoption, pursuant to R.C. 2151.353. Therefore, R.C. 2151.353(A)(4) governs our analysis here. *See id.*, citing *In re B.S.*, 4th Dist. No. 18CA890, 2018-Ohio-4645, ¶ 55.

{¶ 28} R.C. 2151.353(A)(4) states that a juvenile court may commit a child who has been adjudicated as abused, neglected, or dependent to the permanent custody of a public children services agency "if the court determines in accordance with [R.C. 2151.414(E)] that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with [R.C. 2151.414(D)(1)] that the permanent commitment is in the best interest of the child."

{¶ 29} To grant a public children services agency permanent custody of a child under R.C. 2151.353(A)(4), the court must first determine, in accordance with R.C. 2151.414(E), that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent. R.C. 2151.414(E) instructs the court to "consider all relevant evidence" in making that determination. If the court determines, by clear and convincing evidence, that one or more of 16 enumerated factors exists as to each of the child's parents, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." *Id.*

{¶ 30} Once the court determines that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, the court must then determine whether a grant of permanent custody to the agency is in the child's best interest, in accordance with R.C. 2151.414(D). R.C. 2151.353(A)(4). In R.C. 2151.414(D)(1)(a) through (e), the General Assembly has set out a nonexclusive list of factors that a juvenile court must consider in determining the best interest of the child. Those factors are:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**C. Mother does not dispute the juvenile court's finding that N.S., B.S., and J.S. cannot be placed with one of their parents within a reasonable time or should not be placed with either parent.**

{¶ 31} The juvenile court found by clear and convincing evidence that N.S., B.S., and J.S. could not be placed with a parent within a reasonable time, after considering the factors set out in R.C. 2151.414(E). Despite gradual process on her case plans prior to C.S.'s death in October 2019, the court found no indication that Mother had made any progress on her case plans thereafter and found that Mother had failed to substantially remedy the conditions causing the children to be placed outside the home. *See* R.C. 2151.414(E)(1). The court noted that Mother had cut off all contact with FCCS, revoked her authorization for release of information to FCCS, and stopped attending case reviews after October 2019. Mother had been evicted from her home and was in jail, awaiting trial for murder and child endangerment.[5] As to the alleged fathers, the juvenile court found that two—B.S. and John Doe—had never had contact with the children or FCCS and had legally abandoned the children. *See* R.C. 2151.414(E)(10). It also found that none of the three alleged fathers had contacted FCCS regarding the children and that all three had "demonstrated a lack of commitment toward the children by failing to support [them] and [had shown] an

---

[5] The court was unwilling to find "completely satisfied" R.C. 2151.414(E)(5) ("The parent is incarcerated for an offense committed against the child or a sibling of the child") and related sections involving an "offense," because Mother had not yet been found guilty or been sentenced. (Feb. 7, 2023 Decision & Jgmt. Entry at 10-11.)

unwillingness to provide an adequate home for the children." (Feb. 7, 2023 Decision & Jgmt. Entry at 10.) *See* R.C. 2151.414(E)(4).

**{¶ 32}** Mother does not contest the juvenile court's findings under R.C. 2151.414(E) or its conclusion that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. Her assignment of error instead focuses solely on the trial court's determination that granting permanent custody to FCCS was in the children's best interests.

### D. The determination that PCC was in the best interests of the children is not against the manifest weight of the evidence.

**{¶ 33}** In her sole assignment of error, Mother argues that FCCS failed to investigate McSorley as a possible relative placement for the children and that the juvenile court did not address that failure when determining the best interests of the children. Mother contends that, as a result, the juvenile court's determination that permanent custody was in the children's best interests is against the manifest weight of the evidence. (Appellant's Brief at 12.)

### 1. The juvenile court was not required to give preference to McSorley as a placement when determining the best interests of the children.

**{¶ 34}** In applying the best interest factors set out in R.C. 2151.414(D), the "possibility that a relative could provide a permanent placement for a child by assuming legal custody is relevant to the consideration of" the best interest factor in R.C. 2151.414(D)(1)(d), which requires a juvenile court to consider the child's need for a legally secure permanent placement, and whether that type of placement can be achieved without a grant of permanent custody to the agency. *In re J.P.*, 10th Dist. No. 18AP-834, 2019-Ohio-1619, ¶ 27. But R.C. 2151.414(D) "does *not* make the availability of a placement that would not require a termination of parental rights an all-controlling factor." (Emphasis added.) *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 64. In fact, this court has stated, "nothing in R.C. 2151.414 requires a juvenile court to consider granting legal custody of a child to a relative prior to granting permanent custody to an agency." *J.P.* at ¶ 27, fn. 1, citing *In re K.J.D.*, 10th Dist. No. 12AP-652, 2013-Ohio-610, ¶ 37; *In re J.C.*, 10th Dist. No. 09AP-1112, 2010-Ohio-2422, ¶ 17.

**{¶ 35}** Mother argues that the juvenile court should not have granted permanent custody to FCCS, thereby terminating her parental rights, without first requiring FCCS to

undertake "a more diligent effort" to investigate McSorley as a possible relative placement for the children. (Appellant's Brief at 13.) "[A] parent has standing to raise arguments regarding the possibility of a relative assuming legal custody of a child * * * to the extent that those arguments challenge the decision to terminate the parent's rights." *J.P.* at ¶ 27.

{¶ 36} Mother first argues that R.C. 2151.412(H)(2) creates a statutory preference or priority that a child be placed with a relative when possible. R.C. 2151.412(H) states, in relevant part, as follows:

> In the agency's development of a case plan and the court's review of the case plan, the child's health and safety shall be the paramount concern. The agency and the court shall be guided by the following general priorities:
>
> * * *
>
> (2) If both parents of the child have abandoned the child, have relinquished custody of the child, have become incapable of supporting or caring for the child even with reasonable assistance, or have a detrimental effect on the health, safety, and best interest of the child, the child should be placed in the legal custody of a suitable member of the child's extended family.

{¶ 37} R.C. 4151.412(H)(2) instructs a juvenile court to prioritize placing a child in the legal custody of "a suitable member of the child's extended family" when developing and reviewing a case plan, but "there is no such requirement in permanent custody determinations." *In re Tr.T.*, 8th Dist. No. 106107, 2018-Ohio-2126, ¶ 17, citing *In re J.F.*, 8th Dist. No. 105504, 2018-Ohio-96, ¶ 41. *See also In re A.S.*, 4th Dist. No. 16CA878, 2017-Ohio-1166, ¶ 59; *In re J.A.*, 9th Dist. No. 24134, 2008-Ohio-3635, ¶ 26. Therefore, R.C. 4151.412(H)(2) is inapplicable here, when the question before the trial court was whether permanent custody was in the children's best interests. Moreover, even if it were applicable, the "priority" established under R.C. 4151.412(H)(2) provides "only discretionary guidance and is not mandatory." *J.A.* at ¶ 25. *See also In re Halstead*, 7th Dist. No. 04 CO 37, 2005-Ohio-403, ¶ 39.

{¶ 38} Mother also cites *In re A.A.*, 9th Dist. No. 22196, 2004-Ohio-5955, in support of her assignment of error, but *A.A.* is distinguishable from this case on its facts. In *A.A.*, the appellate court reversed the juvenile's court's judgment that terminated a father's parental rights and granted permanent custody of his son to a public children services

agency. The appellate court held that the agency failed to establish that permanent custody was in the child's best interest, as the agency "presented very little evidence to establish" that *any* of the best interest factors in R.C. 2151.414(D)(1) weighed against the father and in favor of granting permanent custody to the agency. (Emphasis added.) *Id.* at ¶ 8. That is simply not the case here, as FCCS presented substantial evidence that the best interest factors weighed in favor of FCCS.

{¶ 39} With respect to the child's need for a legally secure placement and whether that type of placement could be achieved without a grant of permanent custody to the agency, the Ninth District stated, "This best interest factor is often established by the agency presenting evidence that the child needs a secure placement and that neither parent nor any suitable relative is available to care for the child on a permanent basis." *Id.* at ¶ 17. The court continued, "If a legally secure permanent placement could have been accomplished without terminating parental rights, * * * the agency should have explored it and the trial court should have considered this less drastic alternative to permanently severing a family relationship." *Id.* at ¶ 18. Unlike here, however, the evidence in *A.A.* established that the child's aunt was both available and suitable for long-term placement of the child. She "was available and willing to take legal custody of A.A.," even though she would have "prefer[red] to adopt A.A. and not have to deal with [A.A.'s] parents." *Id.* The court faulted the GAL in *A.A.* for basing her opinion that permanent custody was preferable to legal custody on the desires of a potential adoptive parent. *Id.* at ¶ 14.

{¶ 40} In *Schaefer*, 2006-Ohio-5513, the Supreme Court of Ohio reviewed a juvenile court's determination that it was in the best interest of a child to grant permanent custody to a children services agency so the child could continue in his current foster home. The Supreme Court held that the juvenile court satisfied its statutory duty by considering the factors set out in R.C. 2151.414(D)(1) and stated, R.C. 2151.414 "does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* at ¶ 64. Indeed, if an award of permanent custody to the agency is in the child's best interest, as determined by application of the factors in R.C. 2151.414(D), a grant of legal custody to a relative is necessarily *not* in the child's best interest. *In re T.H.*, 8th Dist. No. 107947, 2019-Ohio-3045, ¶ 13.

{¶ 41} Ohio appellate courts have similarly rejected parents' arguments that a juvenile court errs by granting permanent custody of a child to an agency without first determining whether there is a relative suitable for placement. *See In re L.W.*, 8th Dist. No. 104881, 2017-Ohio-657, ¶ 22; *In re O.D.L.*, 2d Dist. No. 28865, 2021-Ohio-79, ¶ 16 ("awarding permanent custody to [an agency] without investigating all possible relatives for placement, standing alone, is not reversible error"); *In re A.C.H.*, 4th Dist. No. 11CA2, 2011-Ohio-5595, ¶ 44 ("the trial court had no duty to first consider placing the children with appellant's relatives before granting [the agency] permanent custody"). Even when a potential relative has been identified, "[a] juvenile court need *not* find, by clear and convincing evidence, that a relative is an unsuitable placement option prior to granting an agency's motion for permanent custody." (Emphasis sic.) *In re C.H.*, 8th Dist. No. 103171, 2016-Ohio-26, ¶ 26, citing *In re B.D.*, 4th Dist. No. 08CA3016, 2008-Ohio-6273, ¶ 29. *See also In re A.B.*, 12th Dist. No. CA2013-03-024, 2013-Ohio-3405, ¶ 34, citing *In re Patterson*, 134 Ohio App.3d 119, 130 (9th Dist.1999). "No preference exists for family members, other than parents, in custody awards." *C.H.* at ¶ 27, citing *In re M.W.*, 8th Dist. No. 96817, 2011-Ohio-6444, ¶ 27, citing *In re Patterson*, 1st Dist. No. C-090311, 2010-Ohio-766, ¶ 16.

{¶ 42} It is noteworthy in this case that neither McSorley nor any other family member filed a motion for legal custody of the children. R.C. 2151.353(A) sets out the types of dispositional orders a trial court may make after a child is adjudicated an abused, neglected, or dependent child. Pursuant to R.C. 2151.353(A)(3), the court may "[a]ward legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings." Inasmuch as she did not file a motion requesting legal custody of the children and was not identified as a proposed legal custodian by a party in a complaint or motion filed prior to the dispositional hearing, the juvenile court lacked authority to award legal custody to McSorley. *See In re L.B.*, 9th Dist. No. 20CA0008-M, 2020-Ohio-3834, ¶ 19.

{¶ 43} Mother also cites R.C. 2151.4116—enacted in 2021 along with related sections R.C. 2141.4115 and 2151.4117 through 2151.4122—as imposing upon FCCS a duty to

investigate potential kinship caregivers, such as McSorley.  R.C. 2151.4116, which took effect on September 30, 2021, states:

> A public children services agency or private child placing agency shall make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in one of following:
>
> (A) Temporary custody of the agency;
>
> (B) A planned permanent living arrangement with the agency.

A "kinship caregiver" includes certain individuals related to a child by blood or adoption, as well as step-parents and step-siblings, legal custodians or guardians, and "[a]ny nonrelative adult that has a familiar and long standing relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties."  R.C. 5101.85(F); R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85(F) for application to R.C. 2151.4116 through 2151.4122).

{¶ 44}  This court recently explained:

> Once a child is in an agency's temporary custody, the juvenile court must determine at every hearing regarding the child whether the agency has satisfied its duty to use intensive efforts to identify and engage an appropriate and willing kinship caregiver.  R.C. 2151.4117.  However, the juvenile court may issue an order relieving the agency of its obligation to exercise intensive efforts if it determines that continuation of the child's current placement is in the child's best interest and that continued intensive efforts are unnecessary based on the findings in R.C. 2151.4119. R.C. 2151.4118.  To issue an order relieving the agency of its statutory obligation under R.C. 2151.4116, the juvenile court must find: (1) "[t]he child has been living in a stable home environment with the child's current caregivers for the past twelve consecutive months," (2) "[t]he current caregivers have expressed interest in providing permanency for the child," and (3) "[t]he removal of the child from the current caregivers would be detrimental to the child's emotional well-being."  R.C. 2151.4119(A) through (C).

*In re L.R.-L.*, 10th Dist. No. 22AP-381, 2023-Ohio-2071, ¶ 12.

{¶ 45}  In *L.R.-L.*, the child entered FCCS's temporary custody in 2019, more than two years before R.C. 2151.4116 took effect.  Nevertheless, the mother argued on appeal that

**Commented [SJE1]:** This could be deleted of you want.  It's not really relevant to this case, but I included it because, reading this, a reader should understand that--even if these statutes had applied--the requirements to excuse FCCS from considering kinship placements would have clearly been satisfied.

FCCS violated its obligation under R.C. 2151.4116 when it rejected as kinship caregivers the mother's friend and the paternal grandfather's ex-girlfriend. We rejected the mother's argument and held that she failed to prove that R.C. 2151.4116 was in effect when FCCS decided not to place L.R.-L. with the mother's friend or the paternal grandfather's ex-girlfriend, as the record did not clearly establish when FCCS considered them as potential placements. *Id.* at ¶ 16. We also stated:

> This case * * * is complicated by the fact that [R.C. 2151.4116] became effective over two years after L.R.-L. entered FCCS's temporary custody and her foster parents' care. Due to that timing, the issue of FCCS's efforts to find kinship care for L.R-L. first arose at the permanent custody hearing. Once a child enters the permanent custody of a public children services agency, the question of whether the child should reside in foster care or with a kinship caregiver while the child is in the agency's temporary custody becomes moot. Consequently, the trial court's ruling granting FCCS's motion for permanent custody rendered the question of who would care for L.R.-L. while she was in FCCS's temporary custody moot.

*Id.* at ¶ 20.

{¶ 46} This case is strikingly like *L.R.-L.* N.S. and B.S. entered FCCS's temporary custody in October 2019, nearly two years before R.C. 2151.4116 took effect, and J.S. entered FCCS's temporary custody upon his birth in August 2020, over a year before R.C. 2151.4116 took effect. The issue of FCCS's efforts to find kinship care for the children under R.C. 2151.4116, which took effect on September 30, 2021, did not arise prior to the permanent-custody hearing in January 2022. Nevertheless, the trial court heard testimony about FCCS's efforts to locate and engage relatives as caregivers and the reasons that those potential caregivers were not appropriate. (*See* Jan. 27, 2022 Tr. at 48-52, 71-73.) Moreover, as in *L.R.-L.*, the trial court's ruling granting FCCS's motion for permanent custody of N.S., B.S., and J.S. rendered moot the question of who should have cared for the children while they were in FCCS's temporary custody.

{¶ 47} The magistrate addressed the minimal contacts between FCCS and McSorley when considering the R.C. 2151.414(D)(1)(d) best interest factor. The magistrate stated: "While Ms. McSorley contacted FCCS over two years ago and then immediately before trial, Ms. McSorley is not known to the children and [Mother] has never identified Ms. McSorley as a possible placement. Further, neither Ms. McSorley nor any other individual, related

or unrelated to the children, has [ever] filed a motion for custody." (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 15.) *See In re O.A.*, 9th Dist. No. 30449, 2023-Ohio-791, (holding that parents failed to demonstrate that legal custody to grandmother would have been in the best interest of O.A. where grandmother did not express interest in receiving legal custody until the permanent custody hearing, had not moved for legal custody, had not filed a statement of understanding under R.C. 2151.353(A)(3), had often missed scheduled visits with O.A., did not cooperate with agency personnel when she did attend scheduled visits, and had not developed a familial bond with O.A.) In light of those findings, which are supported by the evidentiary record, and the above-cited legal authority, we conclude that neither FCCS's failure to investigate McSorley as a potential relative placement for the children nor the trial court's treatment of the evidence related to McSorley's interest in a potential relative placement rendered the trial court's best-interest determination against the manifest weight of the evidence.

> **2. The juvenile court appropriately considered all the best-interest factors in R.C. 2151.414(D) and competent, credible evidence supports the court's determination that an award of permanent custody was in the children's best interests.**

{¶ 48} Having determined that neither FCCS's nor the juvenile court's treatment of McSorley as a possible relative placement renders the juvenile court's best interest determination against the manifest weight of the evidence, we look more broadly at the juvenile court's consideration of the best interest factors set out in R.C. 2151.414(D)(1). The evidence presented at trial strongly supports the juvenile court's findings under the relevant factors and its conclusion that granting FCCS permanent custody of N.S., B.S., and J.S., was in the children's best interests.

{¶ 49} With respect to R.C. 2151.414(D)(1)(a), the court found "overwhelming evidence" of strong bonds between N.S. and B.S. and their foster family, between N.S. and B.S. themselves, and between N.S., B.S., and J.S. (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 13.) The juvenile court held that "uncontroverted evidence demonstrates that the children are connected to their current placement and foster family and have no significant connection to" Mother. (Feb. 7, 2023 Decision & Jgmt. Entry at 16.) N.S., B.S., and J.S. have resided together in the same foster home—a prospective adoptive home—since December 2020, when J.S. joined N.S. and B.S., who had already

been with the foster family for more than a year. N.S. had also previously been placed with the same foster family before she was briefly returned to Mother's care in May 2019. N.S. referred to her foster parents as "mom" and "dad." (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 13.) The court found that J.S., who was only 17 months old at the time of the permanent custody hearing, relied on his foster family for all his needs, that the foster parents provided him with appropriate care, and that he was bonded with both foster parents. (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 13; Feb. 7, 2023 Decision & Jgmt. Entry at 15.) On the other hand, the court found no bond between any of the children and Mother or between any of the children and the alleged fathers. (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 13.) The testimony of FCCS caseworker Layman and GAL Stremski wholly supports the trial court's findings. (*See* Jan. 27, 2022 Tr. at 40-48, 55-60, 94-95.)

{¶ 50} With respect to R.C. 2151.414(D)(1)(b), which addresses the wishes of the child, the juvenile court found that, despite her young age, N.S. had repeatedly expressed to the GAL her desire to "live with her foster parents forever." (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 13; Feb. 7, 2023 Decision & Jgmt. Entry at 15.) The GAL's testimony supports that finding. Although the juvenile court found that B.S. and J.S. were too young to understand the proceedings or to personally express their wishes, the juvenile court noted the GAL's recommendation that a grant of permanent custody to FCCS would be in all the children's best interests.

{¶ 51} R.C. 2151.414(D)(1)(c) requires a juvenile court to consider "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." The juvenile court found—and it is undisputed—that N.S. and B.S. had been in the temporary custody of a public children services agency for 12 or more months of a consecutive 22-month period, and that although a 22-month period had not elapsed with respect to J.S., he had been in FCCS's temporary custody for the entirety of his 17-month life. (Feb. 7, 2023 Decision & Judg. Entry at 15.) N.S. had been in foster care, in the same foster home, for 58 months of her 69-month life. (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 13.) B.S. had been in foster care, in the same foster home, for 27 months of her 31-month life. *Id*. J.S. had spent his entire

17 months of life in FCCS's temporary custody and had been with the same foster family for more than a year. *Id.*

{¶ 52} With respect to R.C. 2151.414(D)(1)(d), the court found that the children were "clearly in need of a legally secure placement that cannot be achieved without a grant of permanent custody" to FCCS. (Mar. 28, 2022 Findings of Fact and Conclusions of Law at 14.) The magistrate's decision, adopted by the trial court, cites FCCS's lengthy involvement with the family, that C.S. suffered fatal injuries while he, N.S., and B.S. were in Mother's sole care and custody, Mother's eviction from her apartment in November 2019, Mother's continued pretrial detention, and Mother's actions that precluded FCCS from assessing her mental health or progress on her case plan since October 8, 2019. *Id.* at 14-15. The juvenile court stated that Mother "has demonstrated over the five years that she has been involved with FCCS [that] she cannot provide a secure permanent placement." (Feb. 7, 2023 Decision & Jgmt. Entry at 16.) In determining that "no parent is able to provide a safe and permanent home for the children," the magistrate reiterated that the alleged fathers had made no contact with FCCS and had made no progress on any of the family's case plans. (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 15.) On the other hand, she stated that the children "have been placed and remain in a foster home that has nurtured and provided for all of their basic needs" and that is a prospective adoptive home. *Id.* The trial court's findings under R.C. 2151.414(D)(1)(d) are fully supported by the evidence presented at trial.

{¶ 53} The magistrate mentions McSorley's contact with FCCS in her discussion of R.C. 2151.414(D)(1)(d), but she discounts that fact because McSorley was not known to the children, had not been mentioned by Mother as a possible placement, and did not file a motion for custody. (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 15.) In its decision and judgment entry overruling Mother's objections to the magistrate's decision, the juvenile court cited those same undisputed facts, as well as precedent from this court that a trial court is not required to consider placing a child with a relative prior to granting permanent custody to an agency. As discussed above, McSorley's minimal contacts with FCCS did not require the juvenile court to consider placing N.S., B.S., and J.S. with McSorley before granting permanent custody to FCCS.

**{¶ 54}** Finally, with respect to R.C. 2151.414(D)(1)(e), which requires a court to consider whether any of the factors set out in R.C. 2151.414(E)(7) through (11) apply, the magistrate stated that two of the alleged fathers—B.S. and John Doe—had abandoned their alleged children and had never had contact with either the children or FCCS. *See* R.C. 2151.414(E)(10) ("The parent has abandoned the child"). The juvenile court, on the other hand, found R.C. 2151.414(D)(5) "[n]ot relevant." (Feb. 7, 2023 Decision & Jgmt. Entry at 16.) That discrepancy does not affect our analysis, however, because elsewhere in its decision, the trial court, like the magistrate, expressly found that B.S and John Doe had legally abandoned their children. *Id.* at 12.

**{¶ 55}** Weighing the evidence presented in light of the factors listed in R.C. 2151.414(D)(1), the trial court found it "clearly in the best interest of [the children] to grant permanent custody" to FCCS. (Mar. 28, 2022 Findings of Fact & Conclusions of Law at 15.) Competent, credible evidence presented during the multi-day permanent custody trial supports the trial court's findings under each of the best interest factors set out in R.C. 2151.414(D)(1), and we cannot find that, upon weighing those factors, the trial court's determination that an award of permanent custody to FCCS was in the best interests of N.S., B.S., and J.S. was against the manifest weight of the evidence.

**V. CONCLUSION**

**{¶ 56}** For these reasons, we overrule Mother's sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

LUPER SCHUSTER and LELAND, JJ., concur.

————————