[Cite as *In re G.H.*, 2022-Ohio-4496.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  | : | JUDGES: |
|  | : |  |
|  | : | Hon. Earle E. Wise, Jr., P.J. |
|  | : | Hon. John W. Wise, J. |
|  | : | Hon. Patricia A. Delaney, J. |
| IN RE G.H., D.K., & D.H. | : |  |
|  | : | Case Nos. 2022 CA 00026 |
|  | : | 2022 CA 00027 |
|  | : | 2022 CA 00028 |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Licking County Court of Common Pleas, Juvenile Division, Case Nos. F2018-0769, F2018-0770, F2018-0840

JUDGMENT:     AFFIRMED

DATE OF JUDGMENT ENTRY:     December 13, 2022

APPEARANCES:

For LCDJFS-Appellee:

WILLIAM C. HAYES
LICKING COUNTY PROSECUTOR

J. BRANDON PIGG
65 E. Main Street, 3rd Floor
Newark, OH 43055

For Father-Appellant:

CAROLYNN E. FITTRO
35 S. Park Place, Suite 202
Newark, OH 43055

For Mother-Appellant:

ROBIN LYN GREEN
P.O. Box 157
Newark, OH 43058

*Delaney, J.*

{¶1} Mother-Appellant, J.H. appeals the April 6, 2022 judgment entry of the Licking County Court of Common Pleas, Juvenile Division awarding permanent custody of G.H., D.K., and D.H. to the Licking County Department of Job and Family Services-Appellee.

## FACTS AND PROCEDURAL HISTORY[1]

### The Children

{¶2} Mother-Appellant, J.H. is the biological mother of G.H., born in January 2005; D.K. born in September 2007; and D.H., born in December 2018.

{¶3} Father, M.S. is the biological father of D.H. Father and Mother are not married. Father filed a separate appeal of the April 6, 2022 judgment entry in *In re D.H.*, 5th Dist. Licking Case No. 2022 CA 00025.

{¶4} The putative fathers of G.H. and D.K. have not appeared in any of the juvenile court or appellate court proceedings.

### Complaints for Dependency

{¶5} Since 2017, there had been three investigations by the Licking County Department of Job and Family Services-Appellee ("LCDJFS") with Mother due to allegations of Mother's drug use. The cases were investigated and closed. In September 2018, LCDJFS again became involved with Mother and Father based on a series of incidents of domestic violence between the two. Mother was seven months pregnant with

---

[1] In her appellate brief, Mother only included as her Statement of Facts pursuant to App.R. 16(A)(6) the "Court's Statement (Findings) of Facts is set forth in Appendix Exhibit 'A'." Mother attached the April 6, 2022 judgment entry as Exhibit A.

D.H. at the time of the investigation. G.H. witnessed the domestic violence. On October 4, 2018, Father was indicted on one count of Domestic Violence, a fifth-degree felony.

{¶6} On October 22, 2018, Father allegedly attacked Mother and G.H. intervened. Father choked G.H. resulting in Mother stabbing Father in the back with cuticle scissors. Both Mother and Father were arrested and placed in jail. Father was charged with Intimidation of a Witness, a third-degree felony; Attempted Felonious Assault, a third-degree felony; Domestic Violence, a fifth-degree felony; and Domestic Violence, a first-degree misdemeanor. The Intimidation charge was based on Father's attempts to persuade Mother not to pursue charges against him.

{¶7} Mother was released from jail. After she was released, Mother refused to file a civil protection order against Father for herself and G.H. She also refused services from LCDJFS. While Father was ordered to have no contact with Mother, Father and Mother continued to communicate with each other. It appeared Mother had no independent source of income and there were concerns about her drug use.

{¶8} On November 9, 2018, LCDJFS filed a motion for a temporary order granting LCDJFS emergency shelter care and custody of G.H. and D.K. LCDJFS simultaneously filed complaints for dependency alleging that G.H. and D.K. were dependent children. The Licking County Juvenile Court granted LCDJFS emergency shelter care of G.H. and D.K. A Guardian ad Litem was appointed for the children.

{¶9} On December 11, 2018, the juvenile court granted an emergency ex parte order of removal for D.H. LCDJFS filed a complaint for dependency for D.H. on December 12, 2018. Pending adjudication, LCDJFS was granted emergency shelter care custody of D.H.

{¶10} An uncontested adjudicatory hearing was held on January 9, 2019, where the juvenile court adjudicated G.H., D.K., and D.H. as dependent children. Mother and Father were present at the adjudicatory hearing and represented by counsel. An uncontested dispositional hearing was held on February 25, 2019, where the children were placed in the temporary custody of LCDJFS.

{¶11} The matter proceeded to a five-day hearing before the Magistrate, starting on January 29, 2021, where the Magistrate took evidence on the following motions:

a. A.S. ("Paternal Great Aunt") Motion for Legal Custody as to D.H.

b. LCDJFS Motion for Permanent Custody as to D.K. and D.H. filed on October 9, 2020.

c. LCDJFS October 9, 2020 Motion to Modify Disposition as to G.H. to a Planned Permanent Living Arrangement ("PPLA").

d. Mother's Motion for Extended Visitation.

e. Mother's Motion for Return of Legal Custody.

f. LCDJFS March 3, 2021 Motion for Permanent Custody and Motion to Withdraw Motion to Modify Disposition as to G.H.

g. LCDJFS April 20, 2021 Motion to Withdraw Permanent Custody and Motion to Modify Disposition for PPLA as to G.H.

h. LCDJFS May 12, 2021 Motion to Consider Permanent Custody and PPLA as alternative pleadings.

{¶12} The following evidence was adduced at the hearing.

**Mother's Case Plan**

{¶13} LCDJFS created a case plan for Mother and Father. There were challenges working with Mother and Father based on Mother and Father's threats of violence against their case workers and Mother's failure to communicate with specific case workers.

{¶14} Mother's case plan objectives were to address the concerns that led to the removal of the three children. She was to complete a substance abuse assessment and follow all recommendations; complete random drug and alcohol screens; do not associate with persons who abuse substances or engage in criminal conduct; participate in counseling services, including domestic violence support groups; and obtain and maintain independent housing and legitimate income sufficient to meet the needs of the children.

{¶15} Mother initially engaged in mental health treatments at the National Youth Advocacy Program in November 2018. She transferred to The Woodlands in January 2019, and then returned to the National Youth program in May 2019. Mother engaged in counseling from May 28, 2019 to June 8, 2020. Mother was diagnosed with Adjustment Disorder, Other Specified Trauma, Post Traumatic Stress Disorder, Anxiety, and Depression. LCDJFS could not monitor Mother's participation in mental health treatment because Mother refused to sign releases of information. During her mental health treatment, Mother did not fully discuss the breadth of the domestic violence between her and Father. Mother continued to have telephone contact with Father while they were incarcerated, as a result of which the calls were recorded. Mother stated they discussed the children and legal matters. A review of the phone calls showed that Mother and Father stated their love for each other, the desire to have another child, and screaming arguments.

{¶16} Mother completed a substance abuse assessment and received substance abuse education. A random drug screen tested positive for cocaine and opiates. Mother denied her substance abuse or abusing alcohol, despite being observed to be extremely intoxicated. During the recorded phone calls, Mother admitted to purchasing heroin for her mother.

{¶17} At the time of the children's removal, Mother was not working and experiencing housing instability. In May 2019, Mother had obtained an apartment in Zanesville, Ohio. She remained unemployed, however, working sporadically at construction jobs with her brother. Mother obtained employment at Speedway, which ended in March 2020. Mother relocated to her mother's home, but there were concerns that housing was not stable. Further, the police had been called to the mother's home due to their disputes, which resulted in Mother's arrest on July 18, 2021 for allegedly punching and biting her mother. The police also found a 12-gauge, sawed-off shotgun in the home. When Mother was arrested, the arresting officer observed Mother to be intoxicated. She was screaming, hostile, and verbally abusive to the officers. Mother was hospitalized and sedated.

{¶18} On July 30, 2020, Mother was indicted on one count of Felonious Assault (F2) and one count of Unlawful Possession of Dangerous Ordnance-Illegally Manufacturing or Processing Explosives (F5). After a jury trial where Mother represented herself and her mother did not appear as a witness, the jury found Mother guilty of Unlawful Possession of Dangerous Ordnance. Mother was sentenced to 300 days in jail (with jail time credit of 242 days) and two years of community control sanctions. Mother

objected and requested to be sentenced to jail rather than community control sanctions, which the trial court sustained. She was scheduled to be released on May 14, 2021.

**Father's Case Plan**

{¶19} Father's case plan was to address the concerns that led to the removal of D.H. He was to complete a substance abuse assessment and follow all recommendations; complete random drug and alcohol screens; do not associate with persons who abuse substances or engage in criminal conduct; participate in counseling services, including The Woodlands' Batter's Intervention Program; and obtain and maintain independent housing and legitimate income sufficient to meet the need of the child.

{¶20} Father was diagnosed with Bipolar Disorder Type II and prescribed medication.

{¶21} Father was initially placed in the community subject to pre-trial bond conditions at which time he pursued reunification. He completed a substance abuse assessment and was deferred for service. Father relapsed on heroin in approximately January or February 2019. He then pursued treatment at Muskingum Behavioral Health. He did not participate in The Woodlands' Batter's Intervention Program due to his pending criminal matters.

{¶22} On July 15, 2019, Father plead guilty and was convicted of domestic violence, intimidation of a witness, domestic violence (F5), domestic violence (F5), and domestic violence (M1). He was sentenced to an aggregate prison term of 18 months incarceration. He was in prison during the COVID-19 pandemic where the programming was limited, but he attended a faith-based substance abuse program.

{¶23} Father and Mother regularly communicated with each other by telephone while Father was incarcerated, so the calls were recorded. The phone calls were hostile and manipulative; at other times, they expressed their love for each other. It was during these phone calls Father and Mother made threats of violence against their case workers.

{¶24} Father was released from prison on November 8, 2020. Father made efforts to reengage his case plan. He engaged in parenting education through Forever Dads in Zanesville, pursued mental health counseling, and obtained housing. As a condition of Father's parole, he was not to have any contact with Mother or unsupervised contact with D.H. By November 23, 2020, Father was incarcerated again due to a parole violation after he continued daily telephone contact with Mother.

{¶25} Father was released from prison on January 8, 2021. He was arrested shortly thereafter due to his continued prohibited contact with Mother. In one recorded incident, Father contacted Mother during a video visit on January 13, 2021, while Mother was incarcerated at the Licking County Justice Center. A third-party appeared on the screen, moving his mouth, while Father remained out of camera view and spoke directly to Mother.

{¶26} The Adult Parole Authority recommended that Father serve a sanction of 160 days in prison for the violation. Father's parole officer found Father to be non-compliant with parole and borderline aggressive. Father made statements to his parole officer that he understood why people like him committed mass shootings.

### Foster Placement, Visitation, and Parental Relationships

{¶27} Upon G.H.'s removal, he was placed in a family foster home with D.H. and D.K. On September 27, 2019, G.H. was placed at the Mohican Young Star Academy

because of an incident of theft. While in this residential placement, G.H. assaulted a peer and was found to purposefully "cheek" his mental health medication. G.H. improved, was discharged from the facility, and placed in a family foster home in November 2020. He began attending bi-weekly therapy. He at first wanted to return to Mother's care or to be placed with relatives in Louisiana, then he expressed a desire to be adopted. On March 18, 2021, G.H. ran away from his foster home. On April 18, 2021, G.H. was arrested and charged as a juvenile with Aggravated Robbery with a gun specification (F1) and Theft of a Motor Vehicle (F4). Since his arrest, G.H. was incarcerated at the Multi-County Juvenile Detention Center.

{¶28} D.K. was placed in a family foster home with D.H. and G.H. D.K. relocated in July 2019 and remained in her second family foster home until July 9, 2020. The second foster family became unavailable due to marital discord and D.K. was placed with a third family foster home from July 9, 2020 to December 11, 2020. While at the third foster home, Mother was contacting D.K., which correlated to D.K.'s increased negative behaviors and mental health. In December 2020, D.K. chose to be placed with G.H.'s foster family. Then G.H. ran away from the foster home. D.K. remained with the foster family who has expressed an interest in maintaining their relationship and possibly adopting her. D.K. attended weekly counseling and was improving.

{¶29} D.H. has also had multiple foster family placements. He left his initial placement in February 2019 and remained with the second foster family home until April 6, 2021, when the foster father experienced mental health issue. D.H. resides in a foster to adopt home, but it is unknown whether he will be adopted. Due to his age and custodial history, D.H. was not bonded with his siblings, Mother, or Father.

{¶30} Father attended supervised bi-weekly visitation sessions with D.H. Father visited D.H. on May 10, 2019 and was then incarcerated. Father attended a supervised visitation with D.H. on November 20, 2020. This was Father's last visitation with D.H.

{¶31} Prior to Mother's incarceration, she attended supervised biweekly visitation with the children. She was a vocal advocate for the care of the children during visitation but was argumentative with the LCDJFS staff. Mother last saw all three children together on March 2, 2020. Mother had difficulty complying with the COVID-19 regulations for visitation. In May 2020, Mother was prohibited from visiting with D.K. because Mother would not comply with the rules, and she hid money in D.K.'s backpack.

{¶32} After Mother moved to the Zanesville apartment in May 2019, Father reported to LCDJFS that G.H. was not at his foster home, but with Mother at her apartment. There were concerns that G.H. would remove D.H. from his foster home. During Mother's supervised visitation with G.H. and D.H., LCDJFS sat in the room because of the flight concerns. Mother denied that G.H. was with her, but on May 12, 2021, Mother admitted that G.H. and his friend were in her apartment.

{¶33} Mother's last contact with D.H. was in July 2020. Mother's last contact with G.H. was June 2020, via Zoom, while G.H. was attending the Mohican Young Star Academy. Mother pursued unauthorized contact with D.K. and G.H. while Mother was incarcerated by sending letters to the children under the name of a different inmate.

{¶34} The juvenile court conducted in camera interviews with G.H. and D.K. D.H. was too young to participate. The children expressed they did not want contact with Father because they were afraid of him.

**Kinship Placements**

{¶35} Paternal Great Aunt moved for legal custody of D.H. She had never met D.H. and no relationship with him. She did not have a relationship with Mother but remained in contact with Father and identified as his support person. The LCDJFS Kinship Care Coordinator found Paternal Great Aunt to have a significant Children's Services history. In January 2019, the eight-month-old infant granddaughter of Paternal Great Aunt was found severely injured in her home that she shared with the father of the infant. Paternal Great Aunt returned home from work and discovered the infant had difficulty breathing. She took the infant to the emergency room and the infant was diagnosed with nine fractured ribs, three skull fractures, a lacerated spleen, and a lacerated liver. The perpetrator of the abuse was not identified, but the Franklin County Children's Services approved Paternal Great Aunt to supervise visitation between the infant and her parents. In 2016, Paternal Great Aunt lost custody of her child for nine months due to the child's domestic violence and drug abuse. Paternal Great Aunt stated she stopped using marijuana in 2020. Paternal Great Aunt failed to file the Statement of Understanding related to her pursuit of legal custody. Mother objected to Paternal Great Aunt's motion for legal custody due to the unknown cause of the infant's injuries. LCDJFS found Paternal Great Aunt to be an inappropriate placement.

{¶36} LCDJFS explored other kinship placements but found them to be inappropriate. The paternal great grandmother of D.K. resided in Louisiana and was considered to be a viable placement for D.K. and G.H., but there were concerns that when Mother lived with the paternal great grandmother and the father of D.K., they engaged in

drug use. The process for Interstate Compact on the Placement of Children was initiated but not completed at the time of the hearings.

## Best Interests

{¶37} LCDJFS testified it was in the best interests of the G.H., D.K., and D.H. to be placed in the permanent custody of LCDJFS. The GAL recommended the termination of parental rights.

{¶38} D.K. and G.H. both expressed a desire to remain together. They wanted to live with their current foster family or be placed in the custody of paternal great grandmother. Neither expressed a desire to reside with Mother.

## Magistrate's Decision, Objections, and Final Judgment

{¶39} The 32-page Magistrate's Decision was filed on September 16, 2021, granting permanent custody of G.H., D.K., and D.H. to LCDJFS. The Magistrate denied the motions for legal custody of Mother and Paternal Great Aunt. The motion for a PPLA for G.H. was also denied. The trial court approved and adopted the Magistrate's Decision on September 16, 2021.

{¶40} Mother and Father filed objections to the Magistrate's Decision. By judgment entry filed on April 6, 2022, the juvenile court overruled Mother and Father's objections in a thoroughly written decision. The juvenile court modified the Magistrate's Decision in part, first finding that Mother had abandoned D.H. and the parental rights of Mother and Father of D.H. should be terminated based upon their abandonment of the child. Second, the juvenile court modified the Magistrate's Decision to order that all visitations and contact between Mother and Father with the children should be terminated immediately.

{¶41} It is from this judgment that Mother now appeals.

## ASSIGNMENT OF ERROR

{¶42} Mother raises one Assignment of Error:

{¶43} "I. THE TRIAL COURT'S ENTRY GRANTING PERMANENT CUSTODY TO THE AGENCY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

## ANALYSIS

{¶44} We recite in full the argument Mother raises in support of her Assignment of Error:

> The Appellant believes that portions of the transcript show that not all the essential elements of this case were found against her. The manifest weight of the evidence is in favor of Appellant and thus the trial court's decision should be reversed.
>
> It is the Appellant's request that The Fifth District Court of Appeals review the entire record and transcript of the cases and determine independently as to whether the lower Court's Entry granting permanent custody is against the manifest weight of the evidence presented at trial.

(Appellant's Brief, July 11, 2022). We find Mother's appellate brief to be minimally compliant with App.R. 16(A)(7) in that she does not cite to the parts of the record in support of her argument. She instead states to the Court that "portions of the transcript show that not all the essential elements were found against her." "If an argument exists that can support [an] assignment of error, it is not this court's duty to root it out." *Fifth Third Bank, National Association v. Hillman*, 5th Dist. Delaware No. 22-CAE-06-0050, 2022-Ohio-4338, 2022 WL 17413722, ¶ 22 quoting *Thomas v. Harmon*, 4th Dist. Lawrence No.

08CA17, 2009-Ohio-3299, ¶ 14, quoting *State v. Carman*, 8th Dist. Cuyahoga No. 90512, 2008-Ohio-4368, ¶ 31.

### Standard of Review

{¶45} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1). Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477, 120 N.E.2d 118. If some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶46} Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

{¶47} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency.

{¶48} Pursuant to R.C. 2151.414(B)(1), the trial court may grant permanent custody of a child to a movant if the court determines at the hearing, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. * * * *.

{¶49} If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶50} R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (e) is present before proceeding to a determination regarding the best interest of

the child. Pursuant to R.C. 2151.414(D)(1), in determining the best interest of a child in a permanent custody proceeding, the court shall consider all relevant factors.

### Twelve Out of Twenty-Two Months

{¶51} The juvenile court determined that pursuant to R.C. 2151.414(B)(1)(d), G.H., D.K., and D.H. were in the temporary custody of LCDJFS for twelve months of a consecutive twenty-two-month period. Mother does not dispute this fact. This Court has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period alone is sufficient to award permanent custody. *Matter of O.M.*, 5th Dist. Coshocton No. 20CA0017, 2021-Ohio-1310, 2021 WL 1424200, ¶ 33 citing *In the Matter of A.S., V.S., and Z.S.*, 5th Dist. Delaware No. 13 CAF 050040, 2013-Ohio-4018. Therefore, a finding that grounds existed for permanent custody cannot be against the manifest weight of the evidence. *Matter of L.G.*, 5th Dist. Stark No. 2020-CA-00139, 2021-Ohio-743, ¶ 36.

### The Judgment is Not Against the Manifest Weight of the Evidence

{¶52} After reviewing the record, Mother's limited arguments on appeal, and the thoroughly analyzed and well written September 16, 2021 Magistrate's Decision and April 6, 2022 Judgment Entry, we find the juvenile court's determination to award permanent custody of G.H., D.K., and D.H. to LCDJFS was supported by competent, credible evidence and not against the manifest weight of the evidence. It was in the best interests of the children to be placed in a legally secure and stable placement.

**CONCLUSION**

{¶53} The judgment of the Licking County Court of Common Pleas, Juvenile Division is affirmed.

By: Delaney, J.,

Wise, Earle, P.J. and

Wise, John, J., concur.