[Cite as *In re D.B.*, 2024-Ohio-1872.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN RE: D.B. | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| | : | Hon. John W. Wise, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| | : | Case No. 2023CA00163 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Stark County Court of Common Pleas, Family Court Division, Case No. 2022JCV00242

JUDGMENT: AFFIRMED

DATE OF JUDGMENT ENTRY: May 15, 2024

APPEARANCES:

For Appellant Father:

RICHARD D. HIXSON
3808 James Court, Suite 2
Zanesville, OH 43701

For Appellee SCDJFS

BRANDON J. WALTENBAUGH
402-2nd St. SE
Canton, OH 44702

Guardian Ad Litem:

ROBIN MINOR
110 Central Plaza S., Ste. 450
Canton, OH 44702

*Delaney, P.J.*

{¶1} Appellant Father appeals from the November 14, 2023 Judgment Entry of the Stark County Court of Common Pleas, Family Court Division, awarding permanent custody of the minor child D.B. to appellee Stark County Department of Job and Family Services ("Agency").

{¶2} This case is related to, but not consolidated with, 5th Dist. Stark No. 2023CA00162, which is Mother's appeal from the same Judgment Entry.

## FACTS AND PROCEDURAL HISTORY

{¶3} Mother and Father are the natural Parents of D.B. (DOB: 4/30/2014). Beginning in September 2021, the Agency became "non-court involved" with the family due to drug abuse and domestic violence concerns. A Safety Plan was developed, but continued violations led the Agency to file a complaint alleging dependency and neglect of the child on March 8, 2022. Emergency temporary custody was awarded to the Agency, guardian ad litem (G.A.L.) was appointed, and an Initial Case Plan was filed with the goal of reunification.

{¶4} D.B. was placed into relative kinship care with Maternal Cousin on March 5, 2022, and has remained in that placement for the pendency of the case. On March 10, 2022, a Proposed Legal Custodian's Statement of Understanding was filed for Maternal Cousin.

{¶5} In April 2022, Mother filed a motion to complete her parenting evaluation at Melymbrosia instead of Lighthouse Family Center.

{¶6} In May 2022, an adjudication hearing was held; Mother and Father both appeared with counsel. Upon conferring with counsel, Mother stipulated to a finding of

dependency. Testimony was taken as to Father and the trial court entered a finding of dependency. The trial court also denied Mother's motion to complete the parenting evaluation at Melymbrosia because the Agency made other concessions regarding the evaluation. Temporary custody was granted to the Agency.

{¶7} In September 2022, a case plan review packet was filed and a disposition review hearing was held. The child remained in the Agency's temporary custody and the trial court found compelling reasons to preclude a request for permanent custody.

{¶8} An amended case plan was filed on November 19, 2022, with a recommendation of reunification.

{¶9} On January 30, 2023, the Agency moved for permanent custody.

{¶10} In February 2023, a case plan review packet was filed and a dispositional review hearing was held. The trial court noted minimal progress was made in some areas and found no compelling reasons to preclude a request for permanent custody. An amended case plan was filed modifying visitation.

{¶11} On April 19, 2023, Father filed a motion for in-camera interview of D.B.

{¶12} On April 27, 2023, the Agency amended its motion for permanent custody and moved to extend temporary custody until September 8, 2023. Mother and Father stipulated to the extension of temporary custody; the trial court granted the extension, found it was not in D.B.'s best interest to reunify at that time, and found the Agency made reasonable efforts to reunite the family. However, service had not been completed and concerns leading to removal had not been alleviated.

{¶13} On September 13, 2023, the Agency filed an [amended] motion for permanent custody. Father filed a motion for an in-camera interview of D.B. which the trial court granted and interviewed D.B. on November 13, 2023.

{¶14} The G.A.L. filed reports on April 1, 2022; September 1, 2022; January 25, 2023; April 20, 2023; July 31, 2023; and November 9, 2023.

{¶15} A permanent custody trial took place on November 9, 2023. The following evidence is adduced from the record of the hearing.

*Caseworker's assessment: Parents failed to remedy behaviors and concerns*

{¶16} The family's ongoing Caseworker has been involved with the family since March 8, 2022. Caseworker met with the family at court, at their house, at the Agency, and in parking lots after Goodwill Parenting.  She called Parents at least once a month to answer questions and to discuss services, compliance, and drug screens.

{¶17} The original issues resulting in Agency involvement included domestic violence between Parents, substance abuse issues, and concerns for D.B.'s safety. Caseworker testified D.B. has been in the temporary custody of the Agency since disposition on May 4, 2022, or more than 12 months of a consecutive 22-month period. Caseworker testified Mother and Father have not been consistent with compliance throughout regular review hearings and D.B. needs and deserves permanency.

{¶18} Caseworker detailed the case plan developed to protect D.B., including a parenting assessment for Mother at Lighthouse Family Center and a parenting assessment for  Father at Melymbrosia, with  both  Parents  required  to  complete  all recommendations.  Parents were ordered to complete a CommQuest assessment for

drug and alcohol use, follow all recommendations, and maintain sobriety. Finally, the case plan required Parents to maintain stable housing and employment.

{¶19} The Agency paid for all costs of these services and had regular meetings with Parents to assess their progress and to encourage further work on the case plan.

{¶20} Mother missed some appointments but eventually completed the parenting assessment at Lighthouse with Dr. Thomas. Mother's diagnosis included Major Depressive Order--Recurrent; Dependent Personality Disorder; Other Specified Anxiety Disorder; Alcohol Use Disorder—Severe; Stimulant Use—Moderate; and ruled out Bipolar II Disorder. The parenting assessment recommended the following for Mother: comprehensive medical health services, including psychiatric services and counseling; take prescribed medications as directed; participate in drug and alcohol treatment with two 12-step meetings per week; successfully complete Goodwill Parenting after a period of sobriety; find employment independent of Father; and demonstrate the ability to protect herself. The case plan required Mother to follow and complete these recommendations.

{¶21} Caseworker feared for Mother's safety because Father was controlling. Father told Caseworker he controls Mother: he controls her employment and income because she works with him, he controls her cell phone, and he carries Mother's insurance card, driver's license, and keys. Caseworker found it difficult to work with each parent independently because Mother seems to be dependent on Father. Caseworker testified the concerns of domestic violence and concerns for Mother's safety continue.

{¶22} Mother was referred to individual counseling and case management services at Phoenix Rising. After a CommQuest evaluation, Mother was referred to Phoenix Rising for sobriety issues. Mother attended counseling with some missed

appointments, but Caseworker testified she saw no changes in Mother's behavior overall and the same concerns persisted.

*Temporary extension terminated by relapses*

{¶23} Parents did gain extra time to work on the plan. After filing the first motion for permanent custody, the Agency amended the motion and extended time for both parents to work on the case plan. Mother was referred to Goodwill Parenting but did not successfully complete the program. Caseworker testified Goodwill Parenting does not recommended reunification.

{¶24} The extension of temporary custody was based in part on a period of negative drug screens. From November 2022 until February 2023, both parents were referred to CommQuest for drug screens. After a period of noncompliance, Caseworker addressed the issue again; after a period of negative screens, Mother was allowed to enroll in Goodwill Parenting and temporary custody was extended.

{¶25} Temporary custody was extended because parents did make some progress on the case plan; they both had a period of sobriety; the home was structurally appropriate; and both were employed by Father's business. This interlude resulted in the referrals to Goodwill Parenting.

{¶26} In August 2023, however, both parents tested positive for cocaine, and were encouraged to reconnect with treatment and do a 12-step program. In September, both parents again tested positive for cocaine, and Mother tested positive in October. Father denied problems with substance abuse and there has been no change. Mother did not reconnect with services after her relapse and is not attending 12-step meetings.

{¶27} Father completed a parenting assessment at Melymbrosia and a report was submitted. The following recommendations were made: maintain sobriety, seek mental health treatment to specifically address control and domineering issues, and domestic violence treatment to address coping skills. These recommendations were part of the case plan and Father was required to follow all recommendations.

{¶28} Caseworker testified Father has complied with monthly mental health treatment at Phoenix Rising and has sometimes acknowledged issues, but has not changed his behavior. Caseworker testified about an incident in a different county involving domestic violence and substance abuse, resulting in criminal charges for Mother. Neither parent notified Caseworker of the incident.

{¶29} Father's parenting assessment determined that if he could maintain sobriety and complete all aspects of his case plan, D.B. could potentially be returned to his custody. However, after the referral to Goodwill Parenting Father was refused admittance due to a positive test for cocaine. Father did not complete case plan services and although he did make some progress, there has been no change in his behavior and the original safety concerns remain.

{¶30} Caseworker summarized that the family has been involved with the Agency for six months non-court and 18 months court involvement, but there is no significant change in the parents' risks or behaviors.

{¶31} Mother was required to make meaningful changes to reduce the risks that led to Agency involvement with the family. Mother was required to maintain complete and total sobriety to alleviate drug abuse concerns; and to successfully engage with counseling, learn coping skills, take prescribed medications, and follow all

recommendations to alleviate mental health concerns.  Mother was required to attend a 12-step program but only completed two meetings throughout the pendency of the case.

{¶32} Father did not report his drug use to the Agency or to his counselor and did not acknowledge his drug use even after testing positive for cocaine two months in a row. Father does not feel he has a problem with drug use and blamed Mother for his drug use.

{¶33} Caseworker testified parents are generally present and engaged at visitation with no major safety concerns.

*Dr. Thomas:  Reunification not recommended*

{¶34} Dr. Aimee Thomas completed Mother's parenting assessment and testified about her contact with Mother. Dr. Thomas found it unusual that Father sat with Mother in the waiting area of Thomas' office in possession of all of Mother's paperwork, including her driver's license and insurance card.  Mother disclosed multiple instances of domestic violence to Thomas in which Father was the perpetrator; D.B. witnessed many of these incidents. Mother said Father blamed her for the violence and Mother blamed herself. Mother agreed the violence increased with substance abuse. Based upon Mother's disclosures, Dr. Thomas has grave concerns for her safety and her failure to protect herself and D.B.

{¶35} Dr. Thomas noted Mother has an older child with a different father. When Father threatened to kill the older child's father, Mother's parenting time with that child was reduced to once a month with restrictions.  Dr. Thomas testified Mother has low self-esteem, low energy, and chemical dependency, and is entrenched in an unhealthy relationship. Mother is not treating her depression and did not take medication as prescribed.   Mother's diagnoses included major depressive disorder-recurrent,

dependent personality disorder, other specified anxiety disorder, rule out bipolar disorder, alcohol use disorder-severe, and stimulant use disorder-moderate. Dr. Thomas recommended that Mother not regain custody of D.B. if she remains in a relationship with Father unless Father successfully completes all aspects of his own case plan. Specifically, Thomas recommended Mother does not regain custody until both parents demonstrate an ability to abstain from all mood-altering substances for at least 9 months outside a controlled environment.

*Goodwill Parenting: Failure to remedy concerns*

{¶36} The Goodwill Skills Training Program Supervisor testified about the parents' referral to and progress in the Goodwill Parenting Program. Mother had consistent attendance, only missing once and tardy twice. Mother's individual goals were to address domestic violence and substance abuse, but none of Mother's goals adequately addressed those concerns. Mother tested positive for cocaine several times and was encouraged to re-evaluate her goals, but did not do so. Mother fails to recognize her triggers to prevent relapse and has no plan to protect herself and not use. Mother did not successfully complete the parenting program, is actively involved in a domestic violence relationship, did not demonstrate learning or change from the program, and received a certificate of non-compliance.

{¶37} Mother's supervised visits with D.B. were problematic because she did not take an active role, had inappropriate conversations with D.B., and caused stress to the child. Goodwill Parenting does not recommend reunification of D.B. with Mother. Mother did ask for assistance several times and assistance was provided, but Mother failed to meet either of her goals.

{¶38} Father was referred for an intake assessment at Goodwill Parenting, but was not accepted into the program due to a positive test for cocaine. Father did not accept responsibility for his cocaine use, claimed Mother forced him to use, and did not acknowledge domestic violence and controlling behaviors.

*Parents' witnesses: Some progress made*

{¶39} Mother's Counselor from Phoenix Rising testified that Mother has worked with her bi-weekly for over a year, addressing self-esteem, abstaining from substance abuse, conscious reactions, and calming skills. Counselor testified Mother has made progress but does not know Mother's mental health diagnoses and was only vaguely aware of the reasons for D.B.'s removal. Counselor was not surprised by the history of drug abuse and domestic violence, but did not recall specifics about Mother's relationship with Father.

{¶40} Father's Counselor from Phoenix Rising testified Father was consistent in his attendance from October 2021 through 2022. Counselor met with Caseworker and was aware of Father's domestic violence and drug abuse issues. Counselor worked with Father on accountability and testified that Father did take accountability for some of these issues. Counselor did acknowledge Father's relapse on cocaine and noted it was a concern because Father was not receptive to substance abuse treatment.

{¶41} Father's Case Manager at Phoenix Rising testified as a witness on his behalf, noting she met with Father several times a week and Mother was usually present also. Case Manager said the home was appropriate and in her opinion the parents were responding to treatment, were cooperative, and engaged. Case Manager did not witness any troubling interactions between the two.

*D.B. remains in relative placement*

{¶42} Upon his removal on March 6, 2022, D.B. was placed with Maternal Cousin and remains in her care. Caseworker testified D.B. loves Maternal Cousin, her partner, and her child, who is like a brother to him. D.B. feels safe and secure in the placement and is bonded with everyone in the home. Maternal Cousin is open to adoption.

{¶43} Caseworker testified D.B. loves Mother and Father, but does not feel safe and secure with them. There have been issues at visitation including parents whispering to D.B. and making him uncomfortable. Father has sometimes provoked upsetting and negative responses from D.B., who worries about the safety of Mother and himself. Caseworker and the G.A.L. testified any harm caused by termination of parental rights would be outweighed by the benefits of safety and permanency.

*Trial court's in-camera interview of D.B.*

{¶44} The trial court conducted an in-camera interview of the child in which he expressed love for his cousin and her family. The child was open and honest, and talkative. He loves his parents very much but is concerned for his safety if he returns home. D.B. is aware of how to hide and call 911 if he is scared; however, the last time he wanted to call 911, Mother took his phone away because Father has been "arrested enough times."

*G.A.L. recommends permanent custody to Agency due to lack of progress*

{¶45} On November 9, 2023, the G.A.L. filed her final report noting concerns with Parents' failure to make progress on the case plan. The G.A.L. cited Parents' drug use, failure to take responsibility for actions leading to D.B.'s removal, violence in the

relationship, mental health issues, and the child's expressed desire to remain in relative placement due to safety concerns with Parents.

{¶46} By Judgment Entry dated November 14, 2023, the trial court granted the Agency's motion for permanent custody of D.B. Both parents timely appealed from the order.

{¶47} Father raises four assignments of error:

## ASSIGNMENTS OF ERROR

{¶48} "I. THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF D.B. AS SUCH A FINDING WAS UNSUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶49} "II. THE CASE PLAN OF STARK COUNTY JFS WAS NOT GUIDED BY THE GENERAL PRIORITIES ENUMERATED IN R.C. 2151.412(H)."

{¶50} "III. THE TRIAL COURT'S GRANT OF PERMANENT CUSTODY OF D.B. TO STARK COUNTY JFS VIOLATED APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW."

{¶51} "IV. FATHER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO ASK THE COURT TO CONSIDER GRANTING LEGAL CUSTODY TO THE AUNT OF D.B. RATHER THAN GRANT PERMANENT CUSTODY."

**ANALYSIS**

I.

{¶52} In his first assignment of error, Father argues the trial court's decision that granting permanent custody to the Agency is in the best interests of D.B. is against the manifest weight of the evidence and is not supported by clear and convincing evidence. We disagree.

{¶53} On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury [or finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction [decision] must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990), the Supreme Court of Ohio explained the following:

{¶54} Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis sic.)

{¶55} In weighing the evidence, however, we are always mindful of the presumption in favor of the trial court's factual findings. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517.

*Permanent Custody Determination*

{¶56} R.C. 2151.414(B)(1)(a) states in relevant part that permanent custody may be granted if the trial court determines, by clear and convincing evidence, that it is in the best interest of the child and the child is not abandoned or orphaned * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶57} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. See, *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613 (1985). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross* at 477, 120 N.E.2d 118.

*Best Interests*

{¶58} R.C. 2151.414(D)(1) sets forth the factors a trial court shall consider in determining the best interest of a child:

> (D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section

2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶59} The juvenile court has considerable discretion in weighing these factors. *In re D.A., supra* at ¶ 47. Although a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, "there is not one element that is given greater weight than the others pursuant to the

statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Moreover, "[R.C. 2151.414(D)(1)] requires a weighing of all the relevant factors * * * [and] requires the court to find the best option for the child * * *." *Id.* at ¶ 64.

{¶60} Father argues the trial court abused its discretion in finding permanent custody to be in the best interest of D.B., arguing the trial court should have placed more weight on R.C. 2151.414(D)(1)(d). However, no single factor is given greater weight or heightened significance. *Matter of K.B.*, 5th Dist. Stark No. 2023 CA 00072, 2024-Ohio-491, ¶ 61, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶61} We review a trial court's best interest determination under R.C. 2151.414(D) for an abuse of discretion. *In re G.B.*, 5th Dist. Stark No. 2023CA00120, 2023-Ohio-4757, ¶ 11, citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. A trial court's failure to base its decision on a consideration of the best interest of the child constitutes an abuse of discretion. *G.B.,* supra, citing *In re R.S.,* 8th Dist. Cuyahoga No. 111353, 2022-Ohio-4387, ¶ 45 (Citation omitted). An abuse of discretion connotes more than an error of law or judgment; it implies the court's attitude is unreasonable, arbitrary or unconscionable*. Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### *R.C. 2151.414(B)(1)(d)*

{¶62} In the instant case, the trial court concluded that R.C. 2151.414(B)(1)(d) applies to D.B., to wit, the child was in the temporary custody of the Agency for twelve or more months of a consecutive twenty-two-month period. D.B. was found to be dependent and placed in the temporary custody of the agency on May 4, 2022, over 12 months before the filing of the first motion for permanent custody on August 2, 2023. We find the

trial court's judgment on this point is supported by competent, credible evidence. *Schiebel*, supra, 55 Ohio St.3d at 74.

{¶63} Father acknowledges the trial court's finding pursuant to R.C. 2151.414(B)(1)(d). This Court has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period alone is sufficient to award permanent custody. *Matter of O.M.*, 5th Dist. Coshocton No. 20CA0017, 2021-Ohio-1310, ¶ 33, citing *In the Matter of A.S., V.S., and Z.S.*, 5th Dist. Delaware No. 13 CAF 050040, 2013-Ohio-4018. Therefore, a finding that grounds existed for permanent custody cannot be against the manifest weight of the evidence. *In re G.H.*, 5th Dist. Licking No. 2022 CA 00026, 2022-Ohio-4496, ¶ 51, citing *Matter of L.G.*, 5th Dist. Stark No. 2020-CA-00139, 2021-Ohio-743, ¶ 36.

*Father's Arguments*

{¶64} Father argues the trial court's finding that permanent custody is in D.B.'s best interest is against the manifest weight of the evidence, pointing to progress Father made on his case plan. We note, however, that appellee's evidence readily established Father has not remedied the conditions resulting in D.B.'s removal, including substance abuse and his domestic violence issues with Mother.

{¶65} A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re A.R.*, 5th Dist. Stark No. 2022CA00148, 2023-Ohio-1359,

¶ 51, citing *In re E.H.*, 5th Dist. Stark No. 2022CA00007, 2022-Ohio-1682, ¶ 101, internal citations omitted.

{¶66} The trial court found reunification with Father was not in D.B.'s best interest. D.B. is doing well in his placement with Maternal Cousin, which may lead to adoption. Caseworker and the GAL both recommended permanent custody of the child to the Agency. Any harm caused by severing any bond with Father is outweighed by the benefits of permanence for child.

{¶67} Father did not make significant progress on his case plan, there was not reasonable cause to believe Father would be reunified with D.B., and it was not in the best interest of the child for stability and permanency. *Matter of W.W.*, 5th Dist. Licking No. 2023 CA 00057, 2023-Ohio-4112, ¶ 30. Upon review, we find sufficient clear and convincing evidence to support the trial court's decision to grant the Agency's motion for permanent custody, and do not find any manifest miscarriage of justice. We further find there is competent, credible evidence to support the juvenile court's decision that it was in the best interest of the child to be placed in the permanent custody of the Agency, and that decision is not an abuse of the trial court's discretion. See, *Matter of C.T.*, 5th Dist. Stark No. 2023CA00119, 2024-Ohio-212, ¶ 43.

{¶68} Father's first assignment of error is overruled.

## II., III.

{¶69} Father's second and third assignments of error will be addressed together. Father argues the case plan was not guided by the general priorities enumerated in R.C. 2151.412(H) and the trial court's award of permanent custody to the Agency violates his right to due process. We disagree.

{¶70} Father argues that R.C. 2151.412(H) creates a statutory preference or priority that a child be placed with a relative when possible and that therefore Maternal Cousin should have been granted legal custody of D.B. We addressed and rejected Father's argument regarding R.C. 2151.412(H) at length in *Matter of K.B.*, 5th Dist. Stark No. 2023 CA 00072, 2024-Ohio-491, as follows.

{¶71} R.C. 2151.412(H) states, in relevant part, as follows:

In the agency's development of a case plan and the court's review of the case plan, the child's health and safety shall be the paramount concern. The agency and the court shall be guided by the following general priorities:

* * *

(2) If both parents of the child have abandoned the child, have relinquished custody of the child, have become incapable of supporting or caring for the child even with reasonable assistance, or have a detrimental effect on the health, safety, and best interest of the child, the child should be placed in the legal custody of a suitable member of the child's extended family.

{¶72} R.C. 2151.412(H)(2) instructs a juvenile court to prioritize placing a child in the legal custody of "a suitable member of the child's extended family" when developing and reviewing a case plan, but "there is no such requirement in permanent custody determinations." *In re Tr.T.*, 8th Dist. No. 106107, 2018-Ohio-2126, ¶ 17, citing *In re J.F.*, 8th Dist. No. 105504, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 41. *See also In re A.S.*, 4th Dist. No. 16CA878, 2017-Ohio-1166, ¶ 59; *In re J.A.*, 9th Dist. No. 24134, 2008-Ohio-3635, ¶

26. Therefore, R.C. 2151.412(H)(2) is inapplicable here, when the question before the trial court was whether permanent custody was in D.B.'s best interests.

{¶73} Moreover, even if it were applicable, the "priority" established under R.C. 2151.412(H)(2) provides "only discretionary guidance and is not mandatory." *J.A.* at ¶ 25. *See also In re Halstead*, 7th Dist. No. 04 CO 37, 2005-Ohio-403, ¶ 39. The language of [R.C. 2151.412(G)] is precatory rather than mandatory. *Matter of Rollinson*, 5th Dist. Stark No. 97 CA 00206, 1998 WL 517866; *See, In Re: Hiatt*, 86 Ohio App.3d 716, 621 N.E.2d 1222 (1983); *In Re: Dixon*, Lucas App. No. L-91-021 (Nov. 29, 1991), unreported; *In Re: Cundiff*, Stark App. No.1995 CA 00102 (Nov. 20, 1995), unreported. Consequently, this statute does not require the trial court to act in a specific manner, but rather suggests criteria to be considered in making its decision regarding case plan goals. *Dixon, supra. In re M.O.*, 4th Dist. Ross No. 10CA3189, 2011-Ohio-2011, ¶ 15.; *In re T.P.*, 3rd Dist. Hancock No. 5-21-36, 2022-Ohio-2995, ¶ 26. (the language of this statute is precatory, not mandatory as is shown by the use of the word "should" instead of "shall").

{¶74} In *Schaefer*, 2006-Ohio-5513, 111 Ohio St.3d 498, 857 N.E.2d 532, the Supreme Court of Ohio reviewed a juvenile court's determination that it was in the best interest of a child to grant permanent custody to a children services agency so the child could continue in his current foster home. The Supreme Court held that the juvenile court satisfied its statutory duty by considering the factors set out in R.C. 2151.414(D)(1) and stated, R.C. 2151.414 "does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* at ¶ 64. Indeed, if an award of permanent custody to the agency is in the child's best interest, as

determined by application of the factors in R.C. 2151.414(D), a grant of legal custody to a relative is necessarily *not* in the child's best interest. *In re T.H.*, 8th Dist. No. 107947, 2019-Ohio-3045, ¶ 13.

{¶75} Ohio appellate courts have similarly rejected arguments that a juvenile court errs by granting permanent custody of a child to an agency without first determining whether there is a relative suitable for placement. *See In re L.W.*, 8th Dist. No. 104881, 2017-Ohio-657, ¶ 22; *In re O.D.L.*, 2d Dist. No. 28865, 2021-Ohio-79, ¶ 16 ("awarding permanent custody to [an agency] without investigating all possible relatives for placement, standing alone, is not reversible error"); *In re A.C.H.*, 4th Dist. No. 11CA2, 2011-Ohio-5595, ¶ 44 ("the trial court had no duty to first consider placing the children with appellant's relatives before granting [the agency] permanent custody"). Even when a potential relative has been identified, "[a] juvenile court need *not* find, by clear and convincing evidence, that a relative is an unsuitable placement option prior to granting an agency's motion for permanent custody." (Emphasis sic.) *In re C.H.*, 8th Dist. No. 103171, 2016-Ohio-26, ¶ 26, citing *In re B.D.*, 4th Dist. No. 08CA3016, 2008-Ohio-6273, ¶ 29. *See also In re A.B.*, 12th Dist. No. CA2013-03-024, 2013-Ohio-3405, ¶ 34, citing *In re Patterson*, 134 Ohio App.3d 119, 130, 730 N.E.2d 439 (9th Dist.1999). "No preference exists for family members, other than parents, in custody awards." *C.H.* at ¶ 27, citing *In re M.W.*, 8th Dist. No. 96817, 2011-Ohio-6444, ¶ 27, citing *In re Patterson*, 1st Dist. No. C-090311, 2010-Ohio-766, ¶ 16.

{¶76} We also note that neither Maternal Cousin nor any other family member filed a motion for legal custody of the child in this case.

{¶77} R.C. 2151.353(A) sets out the types of dispositional orders a trial court may make after a child is adjudicated an abused, neglected, or dependent child. Pursuant to R.C. 2151.353(A)(3), the court may "[a]ward legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings."

{¶78} Inasmuch as she did not file a motion requesting legal custody of the child and was not identified as a proposed legal custodian by a party in a complaint or motion filed prior to the dispositional hearing, the juvenile court lacked authority to award legal custody to Maternal Cousin. *See In re L.B.*, 9th Dist. No. 20CA0008-M, 2020-Ohio-3834, ¶ 19; *Matter of N.S.*, 10th Dist. Franklin No. 23AP-151, 2023-Ohio-4285, ¶¶ 36-42.

{¶79} As a corollary to his argument regarding legal custody, Father argues the trial court violated his right to due process in granting permanent custody to the Agency rather than legal custody to Maternal Cousin.

{¶80} We recognize "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court].'" *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The Ohio Supreme Court has also "long held that parents who are 'suitable' have a 'paramount' right to the custody of their children." *Id.*, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). (Other citations omitted.) Indeed, the right to raise one's "child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990). However, "the natural rights of a parent are not

absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed. Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *In re B.C.*, supra at ¶ 17. (Citations and quotations omitted.)

{¶81} Indeed, "[p]ermanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case. Therefore, parents must be afforded every procedural and substantive protection the law allows." *Id.* at ¶ 19, (Citations and internal quotations omitted). "In the context of termination of parental rights, due process requires that the state's procedural safeguards ensure that the termination proceeding is fundamentally fair." *Id.* at ¶ 17.

{¶82} As discussed supra in our analysis of Father's argument regarding R.C. 2151.412(H), no one filed for legal custody in the instant case, and legal custody to Maternal Cousin was not a factor in the trial court's analysis. As discussed throughout our discussion of Father's first assignment of error, the Agency made every effort to reunify the family by assisting Parents in completion of the case plan, but Parents remained resistant to any meaningful change. *In re Z.G.A.A.*, 5th Dist. Coshocton No. 2023CA0028, 2024-Ohio-326, ¶ 59. The same issues which resulted in the removal of D.B. persisted. *Id.*

{¶83} We conclude the trial court did not violate Father's right to due process by granting permanent custody of the child to the Agency.

{¶84} Father's second and third assignments of error are overruled.

IV.

{¶85} In his fourth assignment of error, Father argues he received ineffective assistance of trial counsel because counsel did not move the court to consider legal custody to Maternal Cousin instead of permanent custody. We disagree.

{¶86} To establish a claim of ineffective assistance of counsel, Father must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A "deficient performance" is one that fell below an objective standard of reasonableness. *Id.* at 687–88. To establish prejudice, Father must show that there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

{¶87} Father argues trial counsel was ineffective in failing to ask for legal custody to Maternal Cousin as an alternative for permanent custody to the Agency. As the Agency points out, any motion to change legal custody would have required a statement of understanding from Maternal Cousin stating she agreed to take legal custody of D.B. The evidence showed, however, that Maternal Cousin did not seek legal custody of D.B. and instead intends to adopt him. We do not discern, and Father does not explain, how a motion for legal custody would have changed the outcome of the permanent custody hearing. There was strong evidence supporting the trial court's decision, including Father's issues with substance abuse and domestic violence, and his inability or unwillingness to remedy those issues. The trial court found permanent custody to be in D.B.'s best interest, a decision we affirmed supra; we have no reason to assume the trial court would have found legal custody to be an appropriate alternative.

{¶88} Upon our review of the record, we find no evidence of deficient performance or prejudice. "The defendant or petitioner has the burden of proof on the issue of ineffective assistance of counsel, as licensed attorneys in Ohio are presumed to be competent." *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). "Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance." *In re J.J.*, 10th Dist. Franklin No. 06AP-495, 2006-Ohio-6151, ¶ 29, citing *State v. Sallie*, 81 Ohio St.3d 673, 675, 693 N.E.2d 267 (1998).

{¶89} Father's fourth assignment of error is overruled.

## CONCLUSION

{¶90} Father's four assignments of error are overruled and the judgment of the Stark County Court of Common Pleas, Family Court Division is affirmed.

By: Delaney, P.J.,

Wise, J. and

Baldwin, J., concur.